**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Leon F. WRIGHT, Appellant.**

**Commonwealth of Pennsylvania, Appellee**

v.

**Stephen D. Freeland, Appellant.**

Superior Court of Pennsylvania.

Submitted March 22, 2004.

Filed Dec. 22, 2004.

William J. Fulton, Harrisburg, for Wright, appellant.

Terrence J. McGowan, Harrisburg, for Freeland, appellant.

Scott A. McCabe, Asst. Dist. Atty., York, for Com., appellee.

Before: ORIE MELVIN, MONTEMURO *, JJ., and McEWEN, P.J.E.

PER CURIAM.

¶ 1 Appellants, Leon F. Wright and Stephen Freeland, bring these appeals from their respective judgments of sentence,[1] which were imposed following their convictions by a jury of murder in the second degree under the pre-amended Crimes Code.[2] We affirm.

¶ 2 This case commenced in the summer of 1969, when on the night of July 18, 1969, York City Police Officer Henry Schaad was wounded by gunfire while traveling through a predominantly African American

---

* Retired Justice assigned to Superior Court.

1. Leon Wright was sentenced to serve a term of imprisonment of from four and one-half years to ten years, and Stephen Freeland was sentenced to serve a term of imprisonment of from nine years to nineteen years.

2. Since this crime occurred in 1969, appellants were prosecuted under the provisions of the Penal Code of 1939, Act of June 24, 1939, P.L. 872, § 701, 18 P.S. § 4701. Under the presently in effect Crimes Code, as amended in 1972, the offense of which appellants were convicted would be murder of the third degree, 18 Pa.C.S. § 2502(c).

neighborhood that was the scene of racial unrest. Two weeks thereafter, Officer Schaad died as a result of the gunshot wounds. At the time he was shot, Officer Schaad was a passenger in a converted bank delivery vehicle, which was thought to be an impervious "armored car,"[3] but which proved vulnerable to large caliber rifle rounds. While these facts are undisputed, almost every other fact of this case was the subject of deep disagreement at trial.

¶ 3 The Pennsylvania State Police initially conducted an investigation of the shooting, but terminated that investigation four months later, in November of 1969, without identifying any suspects. One witness, Barbara Gaines, provided a statement to the York City Police Department that Stephen Freeland shot a rifle at the police vehicle, but shortly thereafter, when given the opportunity, she professed an inability to identify him as the shooter. As a result, the York City police did not pursue the matter against Stephen Freeland. Nor were charges filed against anyone else at that time. Thereafter, little work was done on the case for thirty years.[4]

¶ 4 In 1999, the York City police again interviewed Ms. Gaines,[5] who then signed a statement typed by the police, which stated that Mr. Freeland had in fact fired a rifle round at the armored car on that July 1969 night. A grand jury investigation followed,[6] and the York City police

3. At trial there was testimony from witnesses introduced by the Commonwealth who testified that this armored vehicle aroused particular anger in the African American community of York City because the police would patrol African American neighborhoods in this vehicle and deride the residents with racial epithets. *See:* Testimony of: Richard Rascoe, N.T. March 7, 2002, pp. 1057–1058; Napoleon Baitman, N.T. March 7, 2002, pp. 1134–1135. One witness even testified that the police fired weapons from the vehicle while patrolling the neighborhoods. *See:* Testimony of: Anthony Brown, N.T. March 10, 2002, pp. 1285–1286, 1297. While the police officers who testified denied these allegations, there seems little doubt that the armored vehicle was perceived by the African American community as the embodiment of police oppression, and, as a result became a particular target on the fateful night of Officer's Schaad's shooting. *See:* Testimony of: Michael Wright, N.T. March 6, 2003, pp. 813–814.

4. The work that was done was sporadic at best, consisting largely of interviewing occasional "jailhouse snitches" who attempted to bargain for benefits based on their alleged knowledge of the case. Indeed, the specially assigned judge who presided over the delay hearing even remarked that some of the prosecutors who held the job of District Attorney during the ensuing thirty years "weren't even aware—consciously aware of the case." N.T. November 19, 2002, p. 249.

5. Although the Commonwealth insists that Ms. Gaines initiated the 1999 contact, that fact cannot be verified in the record. Indeed, in her 1999 police interview, the investigating officer makes no mention of how he came to re-interview Ms. Gaines. *See:* Commonwealth Exhibit No. 23. Moreover, her trial testimony does not support the claim that Ms. Gaines sought out the police, to wit:

> [COMMONWEALTH'S ATTORNEY]: In 1969, you were afraid and didn't want to be involved?
> [GAINES]: Right.
> [COMMONWEALTH'S ATTORNEY]: And in '99 you felt the same way?
> [GAINES]: Yes.
> [COMMONWEALTH'S ATTORNEY]: And you feel the same way today?
> [GAINES]: Yes.

N.T. March 10, 2003, p. 1340.

6. The grand jury also investigated the circumstances leading to the death of an African American woman, Lillie Belle Allen, at the hands of some white citizens of York City. This investigation led to the filing of charges against ten individuals, including Charles H. Robertson, a former York City police officer who was, at the time of the indictment, the mayor of York City. The appeals from convictions on second degree murder charges of two of those individuals were recently addressed by a panel of this Court in *Commonwealth v. Neff*, 2004 PA Super 400, 860 A.2d 1063

conducted an extensive investigation, interviewing more than 400 witnesses, including witnesses who identified each of the appellants as firing shots on the night in question.

¶ 5 Leon Wright appeared without counsel before the grand jury in August 2001 and, although he was advised along with several other witnesses of his right to counsel and his right not to incriminate himself, he nonetheless testified. Stephen Freeland also appeared before the grand jury in August 2001, but invoked his right to silence. At the conclusion of the grand jury proceedings, which spanned almost two years,[7] homicide charges were filed on October 30, 2001, against both Mr. Wright and Mr. Freeland. Both filed pre-trial motions, including applications to dismiss the prosecutions by reason of the delay between the 1969 date of the incident and the 2001 date of their respective arrests. The eminent Judge Edward G. Biester was specially assigned by the Pennsylvania Supreme Court to rule on the pre-arrest delay applications, and following an evidentiary hearing in November 2002, denied the motions. A separate hearing was held in December 2002, before the distinguished Judge John C. Uhler, to consider appellants' remaining pre-trial motions,

which were denied.[8] The matter proceeded to a jury trial in March 2003, before the learned York County President Judge John H. Chronister.

¶ 6 The trial lasted nearly two weeks. Although several witnesses described Stephen Freeland as being in possession of a large and powerful rifle, that weapon was never produced as evidence. Stephen Freeland testified on his own behalf and denied shooting at the police vehicle. Leon Wright did not testify at trial, but, upon motion of the Commonwealth, a redacted version of his grand jury testimony was admitted as evidence, which included his denial that he had shot at the vehicle. The remaining evidence against Leon Wright was contradictory—ranging from the testimony of Wright's own brother, who testified that he saw Wright fire a shotgun at the vehicle in which Officer Schaad was riding,[9] to one witness who said that Wright had a pistol,[10] to one who testified that Wright had a rifle with a scope on it,[11] to yet another witness who testified that Wright did not shoot any weapon at all.[12] There was also testimony from Commonwealth witnesses that Stephen Freeland and Leon Wright were among as many as ten people who were armed with rifles that night,[13] and that there were multiple shots

---

(2004), and *Commonwealth v. Messersmith*, 2004 PA Super 401, 860 A.2d 1078 (2004).

**7.** *See:* Brief of Appellee at p. 5.

**8.** The pre-trial motions which were denied by Judge Uhler included appellants' requests for: severance, expanded discovery of the grand jury proceedings, recusal of the judges of York County, changes of venue or jury venire, permission to individually question jurors and jury sequestration, and the suppression of appellant Wright's grand jury testimony.

**9.** Testimony of Michael Wright at N.T. March 6, 2003, pp. 812–813. Michael Wright also identified himself as one of the people shooting at the police vehicle on that night, and the Commonwealth represents in its brief that,

subsequent to the trial in this case, Michael Wright was arrested and charged with homicide as a result of his testimony.

**10.** Testimony of Richard Rascoe at N.T. March 7, 2003, p. 1029.

**11.** Testimony of Barbara Romero at N.T. March 10, 2003, p. 1347.

**12.** Testimony of Anthony Brown at N.T. March 10, 2003, p. 1298.

**13.** Testimony of: Michael Wright at N.T. March 6, 2003, p. 830; Richard Rascoe at N.T. March 7, 2003, p. 1031; Anthony Brown at N.T. March 10, 2003, p. 1278; William Grimes at N.T. March 10, 2003, p. 1389–

fired at the police vehicle.[14] At the conclusion of trial, both men were convicted of second degree murder, and thereafter sentenced to the terms of imprisonment set out above. These separate appeals followed, which we have now consolidated for purposes of addressing the questions they present.

■ ¶ 7 The first argument of both appellants is directed to the extraordinary delay that transpired between the shooting of Officer Schaad and the filing of charges against them. Although the Pennsylvania Supreme Court, in *Commonwealth v. Scher*, 569 Pa. 284, 803 A.2d 1204 (2002) (Opinion Announcing the Judgment of the Court), *cert. denied*, 538 U.S. 908, 123 S.Ct. 1488, 155 L.Ed.2d 228 (2003), sought to resolve the issue confronted by trial courts when there has been a significant period of delay between a crime and the prosecution of that crime, that Court was unable to agree on a controlling standard as to when such delay constitutes a due process violation.[15] The following divergent views of the members the Court reveal that absence of concord on this issue of extensive pre-arrest delay:

—Madame Justice Newman, who penned the lead opinion, expressed the view that in order to demonstrate a constitutional violation a "defendant must first show that the delay caused him actual prejudice," and that the Commonwealth's delay "was the product of intentional, bad faith, or reckless conduct . . . ." *Id.* at 313, 803 A.2d at 1221.

—Mr. Justice Castille, in a Concurring Opinion, agreed that a defendant must first show actual prejudice, but on the issue of delay he was of the mind that the defendant must demonstrate that the delay "was intentionally undertaken by the prosecution to gain a tactical advantage over the defendant." *Id.* at 332, 803 A.2d at 1233.

—Mr. Justice Nigro, in a Concurring Opinion, agreed that a defendant must first show actual prejudice, but did not express an opinion on the validity of the Commonwealth's actions, and saw "no need to even consider the second prong of the test." *Id.* at 340, 803 A.2d at 1238.

—Mr. Justice Saylor, in a Concurring Opinion, also refused to express his view on the standard applicable to the Commonwealth. *Id.* at 341, 803 A.2d at 1239.

—Mr. Chief Justice Zappala, joined by Mr. Justice, now Chief Justice, Cappy, disagreed with the other four Justices on the threshold question of whether the defendant Scher had been prejudiced by the delay in prosecuting the charges against him, since the delay was shown to have "deprived him of evidence critical to his defense." *Id.* at 380, 803 A.2d at 1262. As for the governing standard, the author quoted the Supreme Court's prior Majority Opinion in *Commonwealth v. Snyder*, 552 Pa. 44, 62, 713 A.2d 596, 605 (1998), in which the Court held that a due process violation will be found to have occurred "if no additional evidence appears, the delay results in

---

1390. *See also:* Testimony of Napoleon Baitman at N.T. March 7, 2003 at p. 1113.

**14.** Testimony of: Jeffrey Carter at N.T. March 7, 2003, p. 1213; Alfred Kearse at N.T. March 7, 2003, p. 1265; Anthony Brown at N.T. March 10, 2003, p. 1282.

**15.** We are aware that a prior panel of this Court previously quoted the plurality opinion of the esteemed Madame Justice Newman as precedential authority, *Commonwealth v. Jette*, 818 A.2d 533, 536 (Pa.Super.2003), *appeal denied*, 574 Pa. 771, 833 A.2d 141 (2003), but we very respectfully differ with the *Jette* view that this plurality opinion has precedential status.

actual prejudice, and there are no proper reasons for postponing the defendant's arrest." *Id.* at 357, 803 A.2d at 1248.

—Former Chief Justice Flaherty did not participate in the decision of the Court.

Thus, it is clear that there was no consensus in *Scher* about the standards to be applied in pre-arrest delay cases.

¶ 8 Consequently, in our view, the standards set out by the Supreme Court in *Commonwealth v. Snyder*, 552 Pa. 44, 713 A.2d 596 (1998), and the subsequent application of those standards in the *en banc* decision of this Court in *Commonwealth v. Snyder*, 761 A.2d 584 (Pa.Super.2000) (*en banc*), *appeal denied*, 572 Pa. 703, 813 A.2d 841 (2002), are the touchstones upon which we must analyze the claim of appellant.

■ ¶ 9 The Supreme Court in *Snyder* held that pre-arrest delay constitutes a due process violation where there has occurred "actual prejudice to the defendant" and there existed "no proper reasons for postponing the defendant's arrest." *Commonwealth v. Snyder, supra*, 552 Pa. at 62, 713 A.2d at 605. This Court, thereafter, stated that "even in the face of prejudice, delay is excusable if it is *a derivation of reasonable investigation.*" *Commonwealth v. Snyder, supra*, 761 A.2d at 587 (emphasis supplied), *citing Commonwealth v. Sneed*, 514 Pa. 597, 526 A.2d 749 (1987).[16] Thus, it is clear that any inquiry into pre-arrest delay must be directed to both the existence of prejudice to the defendant and to the cause of the delay.

¶ 10 In this case the learned Judge Biester, in rendering his pre-trial ruling on the delay issue, did not apply the Superior Court *Snyder* "reasonable investigation standard," but instead measured the evidence against the "intentional, bad faith, or reckless conduct by the prosecution" standard advanced by Madame Justice Newman in her lead Opinion in *Scher*.[17] *See:* N.T. November 19, 2002, at pp. 251–252. Since in our view, for the reasons earlier stated, that standard is not the controlling standard, we are unable to accept the basis of the trial court's conclusion on appellants' pre-arrest delay claim. As a result, we are obliged to conduct our own review of the record, applying the standards pronounced by the Supreme Court and this Court in the *Snyder* decision, and to reach our own conclusion as to whether appellants' constitutional rights were violated.

¶ 11 Before proceeding to that examination, however, we must first address the question of where the burden of proof rests in pre-arrest delay cases. In *Snyder*, this Court noted that the Supreme Court, after finding that the defendant there had sustained actual prejudice, remanded the case to the trial court to specifically address the issue of the Commonwealth's reasons for the delay in prosecution. On remand "the matter was considered in the light of the burden be-

---

**16.** Although this Court did not exhaustively discuss those actions which would be considered unreasonable, the Court did state that "any purposeful shelving of a case to gain advantage" would constitute a due process violation. *Commonwealth v. Snyder*, 761 A.2d 584, 589 (Pa.Super.2000) (*en banc*), *appeal denied*, 572 Pa. 703, 813 A.2d 841 (2002).

**17.** Although Judge Biester did not file a written Opinion in support of his decision, his careful study and analysis are reflected in the rationale which he expressed on the record. Most notably, he restricted his analysis to the second prong of the test, and made no finding on the question of prejudice. *See:* N.T. November 19, 2002, p. 252 ("I do not make finding one way or the other with respect to prejudice."). As to that second prong he stated: "I do not find that the evidence shows the delay was a product of intentional, bad faith, or reckless conduct by the prosecution." *Id.* at p. 251.

ing placed on the Commonwealth." *Commonwealth v. Snyder, supra,* 761 A.2d at 586. We then opined that "this [assignment of the burden] was to be expected since on an issue of the propriety for a delay in prosecution, substantially all of the evidence is in the hands of the Commonwealth." *Id.*[18]

¶ 12 Taking our direction from the procedure described in *Snyder,* we deem it appropriate that in extended pre-arrest delay cases there should be a shifting burden, with the initial burden upon the accused to establish that the pre-arrest delay caused actual prejudice, and the subsequent burden upon the Commonwealth to provide a reasonable basis for the extended delay in prosecuting the crime. *See: United States v. Sowa,* 34 F.3d 447 (7th Cir.1994), *cert. denied,* 513 U.S. 1117, 115 S.Ct. 915, 130 L.Ed.2d 796 (1995); *Howell*

*v. Barker,* 904 F.2d 889 (4th Cir.1990), *cert. denied,* 498 U.S. 1016, 111 S.Ct. 590, 112 L.Ed.2d 595 (1990). Such an approach fairly reflects the ability of the respective parties to produce evidence within their control.

¶ 13 With these shifting burdens in mind, it is helpful to compare the Commonwealth's efforts undertaken in the *Snyder* and *Scher* cases, which were ultimately deemed reasonable, to the effort undertaken in this case. This Court in *Snyder* summarized the relevant facts as follows:

> At the hearing before Judge Mundy, the Commonwealth assumed the responsibility of going forward with the evidence, as well as, implicitly, the burden of proof that the reasons for the delay were both valid and proper. In order to

---

**18.** We note that Madame Justice Newman, in her lead opinion in *Commonwealth v. Scher,* 569 Pa. 284, 307, 803 A.2d 1204, 1217–1218 (2002), *cert. denied,* 538 U.S. 908, 123 S.Ct. 1488, 155 L.Ed.2d 228 (2003), quoting *United States v. Crouch,* 84 F.3d 1497 (5th Cir.1996), *cert. denied,* 519 U.S. 1076, 117 S.Ct. 736, 136 L.Ed.2d 676 (1997), suggested that the prevailing federal standard is that the defendant should bear the burden of proof to demonstrate both requirements. However, it bears emphasis that the logic of *Crouch* (as well as the related cases cited), was circumscribed by the following condition:

> We recognize that neither *U.S. v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971) nor *U.S. v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977) is crystal clear on this issue [of burden of proof], and each opinion contains some language that can give comfort to either view. However, we believe that the better reading of these opinions is that the Supreme Court, *in instances where the statute of limitations has not run,* has refused to recognize a claim of preindictment delay absent some bad faith or improper purpose on the part of the prosecution.

*Crouch, supra,* 84 F.3d at 1510 (emphasis supplied). Thus, the rationale was founded

upon the legislative fixing of a period in which to bring a prosecution, which carries with it an imprimatur of due process. In such situations, it is jurisprudentially sound to place the burden on the defendant to overcome such presumptive legitimacy. Where, however, as in the case of homicide, the legislature has opted to place "no limitation" on the ability of the Commonwealth to bring a prosecution, there is no defined period which can be presumed to satisfy due process. *See:* 42 Pa.C.S. § 5551. Therefore, the approach which more closely meets the standard of due process is the one taken by the trial court in *Snyder,* and accepted by this tribunal, specifically, that the defendant bears the initial burden of demonstrating actual prejudice resulting from the pre-arrest delay, whereupon the Commonwealth must assume the burden of going forward to explain the reasonableness of its investigative efforts. *See e.g.: Howell v. Barker,* 904 F.2d 889 (4th Cir.1990), *cert. denied,* 498 U.S. 1016, 111 S.Ct. 590, 112 L.Ed.2d 595 (1990); *State v. Alexander,* 310 N.J.Super. 348, 708 A.2d 770 (App.Div.1998), *certification denied,* 156 N.J. 408, 719 A.2d 640 (1998). Any other approach would place the defendant in the virtually impossible position of accurately discerning the thinking of bygone administrations of the various prosecuting attorneys.

do so, it called as witnesses the decision and policy-makers who were in authority, from the time of the fatal arson to the time of appellant's arrest. The District Attorney of Luzerne County, at the time of the fatal fire, Robert J. Gillespie, Jr., established that the victims were appellant's wife, Diane, and his 36 day-old son, Brian, and that Keith Snyder, appellant, was a suspect. Two aspects of the case which were problematic, were the burn time of the fire and the presence of the drug tuinal in Diane's bloodstream. He opined that, while he felt there was sufficient evidence to arrest appellant, he was not satisfied that there was enough to achieve a conviction. Gillespie was in office from January 1982 to December 1985. In the fall of 1984, he was authorized to empanel what he described as the first investigating Grand Jury in his county's history, to investigate several criminal matters, including the Snyder investigation. At the time of his departure from office, he felt that there was insufficient evidence to sustain a conviction. Bernard Podcasy succeeded Gillespie and served until January, 1988. He received a unanimous Grand Jury report in August of 1986 which recommended that, while there was unequivocal evidence of incendiary origin, the evidence to support an indictment was insufficient. The panel recommended vigorous pursuit of the investigation. Other than pursuit of a fruitless anonymous tip and being immersed in current business, there was no especial proactivity on the Snyder matter during the remainder of his term. Correale Stevens served from January, 1988 to July, 1991. He was briefed on the case and had some key staff members review the matter, but determined thereafter that there was not enough to warrant an arrest. His overall view as to older unsolved cases was that they were primarily police matters. (The investigations were being pursued by the Wright Township Police and the Pennsylvania State Police).

Jerome Cohen served as District Attorney for five months and took no action. He, as did Stevens, stated that any inactivity was not for the purpose of achieving tactical advantage. Robert Martz was a regional chief for the Pennsylvania State Police. He reviewed the investigation file on six to eight occasions and consulted with his commander as well as District Attorney Stevens. Martz considered it an open investigation. Joseph A. Jacob, the Chief of Police of Wright Township, advised that he reviewed the evidence two times a year and did not repetitively re-interview the witnesses since to do so is often counterproductive; he had conferences with experts and other law enforcement persons on numerous occasions, maintained periodic contact on the case with the State Police, and maintained observation of the suspect. When, as a result of District Attorney Olszewski's reappraisal of the case, renewed interviews were conducted he found that certain witnesses who had had an allegiance to the suspect were more forthcoming when a common employer closed its operation and they were no longer co-employees of appellant. The key to the eventual institution of criminal proceedings came after Peter Paul Olszewski, Jr., took office as District Attorney in 1992. [Following an exhaustive new investigation, charges were filed against the defendant within two years.]

*Commonwealth v. Snyder, supra,* 761 A.2d at 587–588.

¶ 14 The factual history in *Scher,* as recorded in the lead Opinion of the Supreme Court, is as follows:

On June 4, 1976, at 11:30 a.m., two days after his [first] statement to Trooper Hairston, Scher came to the District Attorney's Office at the Susquehanna County Courthouse in Montrose, at the request of the investigators, and gave a statement. At the interview were Williard Collier, the detective for the Susquehanna County District Attorney's office, Troopers John Salinkas and John Fekette of the Pennsylvania State Police, and a secretary from the Susquehanna County District Attorney's office. At the commencement of questioning, Trooper Fekette advised Scher of his *Miranda* rights, which Scher waived and agreed to be questioned without a lawyer present. During this interrogation, Scher repeated essentially the same story that he had related in his June 2, 1976, statement to Trooper Hairston. Scher explained that he and Dillon had gone to Gunsmoke to go skeet shooting, that they were returning to the trailer to get cigarettes, that Dillon thought he saw a porcupine and ran up the path to pursue it, and that Scher heard the shot and followed after, where he found Dillon lying on the ground with a gunshot wound to the chest. One noteworthy difference between this second statement and the June 2, 1976, statement was that Scher said that he had placed the sixteen-gauge shotgun against a tree, whereas his June 2, 1976, statement indicated that he had placed the loaded shotgun on the metal gun stand. When asked whether he and Dillon had any disagreements, Scher said, "No. We were talking about this rumor. I told him I was thinking of leaving town. It was rough on him. He sat and told me I was just a quitter and chicken—'don't run away ... it was just small people talking." ' After giving this answer, Scher became angry, terminated the interview, and left the room.

Edward Little, the District Attorney of Susquehanna County from 1968 to 1980, testified at pretrial hearings on Scher's Motion to Dismiss as to the state of the investigation in June of 1976, and explained why no charges were filed during his tenure in office. Dr. James Grace, a general practitioner who conducted an autopsy of Dillon on June 3, 1976, had issued a report that explained, "history given of [Dillon's death] having been involved in a hunting accident," and listed the cause of death as "gunshot wound of the chest," but made no determination whether the death was the result of a homicide. Coroner Conarton, who was present when Scher gave his June 2, 1976 statement to Trooper Hairston, had determined that Dillon's death was accidental and had listed this as the manner of death on Dillon's death certificate. Although Detective Collier had a strong belief that Dillon's death may have been a murder rather than an accident, and expressed this opinion in a June 9, 1976, report to Little, Scher was not arrested. Little explained that he, too, was not convinced that Dillon's death was an accident and requested that Coroner Conarton delay issuance of the death certificate in order to allow additional time to conduct the investigation. Little testified, however, that he never brought charges against Scher because he felt that there was insufficient evidence of murder to prosecute the case successfully.

Laurence Kelly succeeded Little as District Attorney of Susquehanna County in 1980, and held that office until 1988. Little testified that he had no discussions with Kelly regarding the investigation into Dillon's death. Kelly confirmed that: (1) he had no conversation with either Little or Detective Collier concerning Dillon's death; (2) he did not

know where in the office the investigative file on the Dillon matter was located, nor did he look for it; (3) he did not initiate any investigation concerning the death of Dillon; (4) he gathered no additional evidence into Dillon's death; (5) he conducted no review of the evidence gathered during the initial investigation; and, (6) he never met with anyone from the Pennsylvania State Police regarding the Dillon case. For eight years, therefore, the investigation into the Dillon matter was dormant.

\* \* \* \*

Jeffrey Snyder was the District Attorney of Susquehanna County from 1988 until 1996. In 1989, District Attorney Snyder received a telephone call from Al Riemel, a social acquaintance of the Snyder family and the brother-in-law of Martin Dillon, requesting a meeting at the home of Lawrence Dillon, the father of Martin Dillon. Prior to this telephone call, Snyder had not conducted any review of the Dillon case, but had the District Attorney's Office investigative file retrieved from storage in order to review the matter. District Attorney Snyder reviewed the Dillon file, but found that it contained "little to no information" and decided to meet with the state police to discuss the status of the case. At the behest of Lawrence Dillon, Snyder arranged meetings with the original Pennsylvania State Police investigators, Troopers John Salinkas and John Fekette, and reviewed the state police investigative file. District Attorney Snyder agreed to have the facts as developed by the investigation to that point presented to a panel of medical experts who were holding a conference at the University of Pennsylvania, in Philadelphia. In May of 1989, Snyder went to the conference to "get some consensus from those in the forensic field" about whether Dillon died by accident or was murdered. The conference attendees consisted of medical examiners, pathologists, and coroners. Three members of the Pennsylvania State Police accompanied Snyder to the conference, along with Dr. Isadore Mihalikis, a forensic pathologist who actually presented the case to the conference attendees. Following this presentation, a significant majority of the conference members opined that a self-inflicted gunshot wound, either accidental or intentional, caused Dillon's death. Snyder viewed this vote as "an overwhelming defeat for the prosecution" and concluded that no successful prosecution could be mounted at that time. Although the investigation remained open, the Susquehanna County District Attorney's Office took no substantial steps to advance the investigation for the next five years.

In 1990 and 1991, Lawrence Dillon retained private investigators to look into the case and unsuccessfully petitioned to have Dillon's body exhumed for another autopsy. At that time, Snyder felt that the efforts of the Dillon family were counterproductive to a successful resumption of the investigation. However, in 1994, again at the urging of the Dillon family, two Pennsylvania State Police officers who had no previous involvement in the case were brought in to reexamine the evidence, conduct interviews with witnesses, and, in Snyder's words, "winnow out the rumor, the innuendo, that in my opinion riddled much of the material that was already on file." The "rumor" referred to by Snyder was the report that Scher and Dillon's wife, Patricia, had been having an affair before Dillon's death. These rumors were known to investigators at the time of the incident but, for reasons that do not appear in the record, were not pursued. The officers who were placed in charge

of the state police investigation in 1994 reinterviewed witnesses and interviewed additional witnesses who had not been questioned in 1976. Based on this renewed investigation, the Commonwealth finally developed evidence of a motive for Scher to murder Dillon that had not been developed in the earlier investigation: namely, that Scher and Patricia had been having an extramarital affair prior to Dillon's death. In 1995, the Commonwealth successfully petitioned, in spite of the objection of Patricia Scher, to have Dillon's body exhumed for a second autopsy. Following this second autopsy in April of 1995, the Commonwealth obtained support from its expert forensic pathologist, Dr. Mihalikis, for the position that the physical evidence of Dillon's gunshot wound was not consistent with an accidental discharge of a dropped shotgun. The Commonwealth concluded that it possessed sufficient evidence to prosecute murder charges successfully and charged Scher with first-degree murder in June of 1996.

*Commonwealth v. Scher, supra,* 569 Pa. at 294–298, 803 A.2d at 1210–1212 (footnotes omitted).

¶ 15 The pre-trial hearing in this case established the contrasting dearth of activity that occurred here, specifically:

- The District Attorney of York County at the time of the shooting was unavailable to testify at the pre-trial hearing on delay, but his first assistant testified that in 1969 it was not the function of the District Attorney to investigate crimes, and that the District Attorney depended on the State and local police to investigate a crime, produce the evidence and then bring the case to the District Attorney to be prosecuted. Thus, in the months immediately following the shooting, the District Attorney's Office undertook no investigation of this shooting. *See:* N.T. November 19, 2002, pp. 122–127.

- Over the next sixteen years, from 1970 to 1986, there were four different District Attorneys, none of whom undertook an investigation of the Schaad shooting.[19] In fact, in the words of one of the prosecutors, the Schaad case "was not on any of the radar screens." N.T. November 19, 2002, p. 139.

- In 1986 H. Stanley Rebert became the York County District Attorney, and he held the office from 1986 up to the time of the filing of this appeal. He testified that upon taking office in 1986, he had no discussion with his predecessor regarding open cases, and there was no open file on the Schaad matter. Moreover, during his time as District Attorney, he never contacted the York City Police Department to check on the status of this case. *See:* N.T. November 19, 2002, p. 134. Mr. Rebert further testified that during his tenure there were two instances prior to the present investigation, in which the Schaad shooting came up, and in both instances it was a collateral matter where a defendant was attempting to obtain a benefit in his unrelated case by offering to reveal information on this case—in neither instance, however, was the information considered substantial, and no follow-up investigation ensued. *See:* N.T. November 19, 2002, pp. 127–134; 147–174.

19. Judge Biester, who presided over the delay hearing, cogently observed that some of the prosecutors who served as District Attorney during the ensuing thirty years "weren't even aware—consciously aware of the case." N.T. November 19, 2002, p. 249. *See:* Footnote 4, *supra.*

Thus, it was not until 1999 that District Attorney Rebert launched the investigation that culminated in this prosecution, and while all would agree that this investigation was comprehensive, the question before this Court is why the field of investigation was allowed to lie fallow for thirty years while witnesses died and evidence disappeared. Based on our review, while emphasizing that there is absolutely no intent to find fault or assess blame, we, nonetheless, can find no reasonable basis for such inaction, and the excuses offered by the Commonwealth are simply inadequate to explain its passivity in failing to pursue an investigation of an unlawful killing.

20. Although the paradigm we have proposed for examining pre-arrest delay cases places the initial burden on the defendant to demonstrate prejudice, in the posture of this case, where the trial court had only considered the Commonwealth reasons for the delay, we reserved our consideration of the prejudice issue until we had concluded that, contrary to the ruling of a most discerning trial court, the Commonwealth offered no reasonable basis for the thirty year pre-arrest delay.

21. Appellants were convicted of murder of the second degree as defined in the Penal Code of 1939. In order to obtain this conviction the Commonwealth was required to prove that the murder was the result of a malicious act. *Commonwealth v. Gooding*, 818 A.2d 546, 550 (Pa.Super.2003), *appeal denied*, 575 Pa. 691, 835 A.2d 709 (2003). "Malice consists of a 'wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured.'" *Id.* The trial judge instructed the jury on the underlying crime of second degree murder as follows:

> You may find the defendant[s] guilty of second-degree murder if you are satisfied that the following three elements have been proven beyond a reasonable doubt: First that Henry Schaad is dead; second, that the defendant killed him, either as the person who actually fired the shot or as an accomplice; and third, that he did so with malice.

¶ 16 This conclusion requires us to take the further step of examining the question of prejudice.[20] Appellants were convicted of second degree murder (an offense which has since been re-codified as third degree murder).[21] In order to sustain this conviction, the Commonwealth was required to prove that the murder was the result of a malicious act, which in turn required the Commonwealth to prove that appellants were either the individuals who caused the death of Officer Schaad *or* were accomplices to that individual.[22]

¶ 17 In order to prove the direct culpability of either appellant, the Commonwealth was required to establish, beyond a

> The word malice, as I am using it, has special legal meaning. It does not mean simply hatred, spite, or ill-will. Malice is a shorthand way of referring to the three different mental states that the law regards as being bad enough to make a killing murder[.] [T]hus a killing is with malice if the killer acts first with the intent to kill; but of course, that would be first degree murder. Second, with the intent to inflict serious bodily harm, or third, with a mental state that shows a wickedness of disposition, a hardness of head, a cruelty, recklessness of consequences, and a mind regardless of social duty indicating an unjustified disregard for the probability of death or great bodily harm and an extreme indifference to the value of human life.
> An alternative definition would be a conscious disregard of an unjustified and extremely high risk that his actions might cause death or serious bodily harm.
> So whether it is first-degree or second-degree murder, you have to establish malice. If the malice that you are finding is specific intent to kill, then it is first degree. If it is not specific intent to kill but meets the definition of malice, then it is second-degree murder.

N.T. March 13, 2003, pp. 1872–1872.

22. Under the Penal Code of 1939, accomplice liability was defined at 18 P.S. § 5105. Act of June 24, 1939, P.L. 872, § 1105.

reasonable doubt, the source of the bullet that killed Officer Schaad. However, the Commonwealth did not do so since the forensic evidence produced by the Commonwealth consisted only of the following:

- Dr. Isidore Mihalakis, a forensic pathologist, testified that Officer Schaad "died of a rifle wound to the chest and consequences thereof." N.T. March 7, 2003, p. 1022. He further testified that during his autopsy of the body, he retrieved the bullet that caused the fatal injury.

- Corporal Eugene Pete Baltimore, Jr., of the Pennsylvania State Police, testified as a ballistics expert on direct examination, that from his tests he could only determine that the bullet came from either a .30 caliber or 8 millimeter rifle, "but [he] couldn't determine, specifically, if it was one or the other." [23] N.T. March 10, 2003, p. 1424.

- Mr. Alfred Schwoebel, an expert in "trace metal analysis," testified that the wounds in Officer Schaad's torso and the wound in his thigh came either from the same bullet, or two bullets from the same manufacturer's lot. He could not, however, further identify which manufacturer that would have been.

Clearly, the inability of the Commonwealth's forensic witnesses to accurately identify the size of fatal bullet, or even the make, model, or country of origin of the rifle from which it was fired, made it impossible for the appellants to defend against the Commonwealth unprovable as-

---

23. On cross examination Corporal Baltimore expounded on his uncertainty, when he testified as follows:

[APPELLANT FREELAND'S COUNSEL]: As far as manufacturers go ... [y]our report indicates that your examination of P–1, which is that bullet [which delivered the fatal wound], right, that deformed bullet we're talking about—
[BALTIMORE]: Yes.
[APPELLANT FREELAND'S COUNSEL]:—could have been discharged from but not limited to one of the following makes of firearms. And then you list FM Browning, correct?
[BALTIMORE]: Correct.
[APPELLANT FREELAND'S COUNSEL]: J.C. Higgens, and you have in parens, Sears-produced rifle?
[BALTIMORE]: Correct.
[APPELLANT FREELAND'S COUNSEL]: A Mauser?
[BALTIMORE]: That's correct.
[APPELLANT FREELAND'S COUNSEL]: A Galil assault weapon? What's IMI?
[BALTIMORE]: Israeli Military Industries. Correct.
[APPELLANT FREELAND'S COUNSEL]: Schultz, correct?
[BALTIMORE]: Yes.
[APPELLANT FREELAND'S COUNSEL]: Smith & Wesson?
[BALTIMORE]: That's correct.

[APPELLANT FREELAND'S COUNSEL]: And then U.S. military weapons?
[BALTIMORE]: Correct.
[APPELLANT FREELAND'S COUNSEL]: And that would be where the 30—40 Krag would be involved?
[BALTIMORE]: Yes.
[APPELLANT FREELAND'S COUNSEL]: And what other military weapons would possibly be connected with this item P–1?
[BALTIMORE]: The 1903 Springfield, the M1 Garand, and the Browning Automatic Rifle Model 1918.
[APPELLANT FREELAND'S COUNSEL]: So those all would be included under U.S. military weapons?
[BALTIMORE]: Correct.
[APPELLANT FREELAND'S COUNSEL]: And then we have Winchester, is that right?
[BALTIMORE]: Yes.
[APPELLANT FREELAND'S COUNSEL]: All right. So *all those manufacturers are possibilities in this case, is that right?*
[BALTIMORE]: *Yes, they are.*
[APPELLANT FREELAND'S COUNSEL]: *And you can't say which one is more likely to have been—would have shot that bullet, can you?*
[BALTIMORE]: *No, I can't.*
N.T. March 10, 2003, pp. 1445–1446 (emphasis added).

sertion that one of them had fired the fatal bullet.

¶ 18 However, since the Commonwealth presented these cases to the jury on the alternative theory of accomplice liability, we must examine appellants' culpability under that theory as well. In relevant part the jury was instructed:

You may find the defendant guilty of a crime on the theory that he was an accomplice as long as you are satisfied beyond a reasonable doubt that the crime was committed and that the defendant was an accomplice of the person who committed it.

And it does not matter whether the person who actually committed the crime is a defendant or not. You may find that somebody else [sic] other than one of these two defendants actually fired the shot, and even if that person is not charged, you can still find that these defendants are guilty if you find their conduct meets the definition of accomplice that I just gave you and it was proven that the other person did it.

And like everything else in a criminal case, the Commonwealth has to prove that either of these defendants was an accomplice beyond a reasonable doubt. So to try to put it into language that is a little bit simpler to understand, that is not quite so legal, what we are looking for is that there was joint action, that they were acting together, that they had a common plan.

Now, in order to show that they are accomplices, the Commonwealth does not have to bring in testimony where it shows there was a specific conversation,

that they agreed to be accomplices and prove it to you by specific agreement. The Commonwealth could show that they are accomplices by showing the actions and allowing you to infer from the way and manner they acted that they were acting jointly and therefore, that they were accomplices.

N.T. March 13, 2003, 1874–1875. Thus, the jury was instructed that appellants could be found liable of second degree murder under the theory of accomplice liability *regardless* of whether the Commonwealth could accurately identify the source of the fatal bullet,[24] and in order to sustain its burden to prove this accomplice theory the Commonwealth was required to demonstrate that appellants were present, that appellants were, in concert with others, shooting at the armored vehicle with a *mens rea* that qualified as malice, and that Officer Schaad died as a result. Since the delay in this case did not prevent appellants from defending against this theory, either by attacking the memories of the Commonwealth's witnesses or, in the case of Freeland, taking the stand and denying involvement, we are compelled to conclude that regardless of the unjustifiable delay the constitutional rights of appellants to a fair trial were not violated.

¶ 19 In light of our decision on the appellants' common issue we must now address those issues that are unique to each appeal.

### Appeal No. 1203 MDA 2003

■ ¶ 20 Leon Wright, in appeal No. 1203 MDA 2003, presents these further questions for our review:[25]

---

**24.** It bears emphasis that neither of the appellants has challenged the accuracy of the jury instructions.

**25.** We have set out the remaining questions for review in the order we have chosen to

address them, and have restated them to comply with the mandate that such questions should be stated "in the briefest and most general terms, without names, dates, amounts or particulars of any kind." Pa.R.A.P. 2116(a).

Whether the evidence adduced by the Commonwealth was insufficient to support the verdict?

Whether the trial court erred in overruling a motion for change of venue or venire because of unusually extensive and inflammatory pretrial publicity?

Whether the trial court erred in not granting a motion to suppress appellant's grand jury testimony and in admitting into evidence a redacted transcript of his testimony after appellant summarily waived his right to counsel in a general group colloquy?

¶ 21 The applicable standard of review governing a sufficiency challenge requires the reviewing court to determine: whether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner, together with all reasonable inferences therefrom, the trier of fact could have found that each and every element of the crimes charged was established beyond a reasonable doubt. *Commonwealth v. Montini*, 712 A.2d 761, 767 (Pa.Super.1998); *Commonwealth v. Swann*, [431 Pa.Super. 125] 635 A.2d 1103, 1105 (Pa.Super.1994), *appeal denied*, 538 Pa. 669, 649 A.2d 671 (1994). In making this determination, we must evaluate the entire trial record and consider all the evidence actually received. *Commonwealth v. Rodriquez*, [449 Pa.Super. 319] 673 A.2d 962, 965 (Pa.Super.1996). It is within the province of the fact finder to determine the weight to be accorded each witness's testimony and to believe all, part, or none of the evidence introduced at trial. *Commonwealth v. Molinaro*, [429 Pa.Super. 29] 631 A.2d 1040, 1042 (Pa.Super.1993). The facts and circumstances established by the Commonwealth need not be absolutely incompatible with the defendant's innocence, but the question of any doubt is for the trier

of fact unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances. *Commonwealth v. Seibert*, [424 Pa.Super. 242] 622 A.2d 361, 363 (Pa.Super.1993), *appeal denied*, 537 Pa. 631, 642 A.2d 485 (1994) (*citing Commonwealth v. Sullivan*, 472 Pa. 129, 150, 371 A.2d 468, 478 (1977) and *Commonwealth v. Libonati*, 346 Pa. 504, 508, 31 A.2d 95, 97 (1943)). "This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." *Commonwealth v. Swerdlow*, [431 Pa.Super. 453] 636 A.2d 1173, 1176 (Pa.Super.1994) (*citing Commonwealth v. Hardcastle*, 519 Pa. 236, 246, 546 A.2d 1101, 1105 (1988)).

*Commonwealth v. Randall*, 758 A.2d 669, 674 (Pa.Super.2000), *appeal denied*, 564 Pa. 707, 764 A.2d 1067 (2000).

¶ 22 Appellant Wright argues that the Commonwealth's evidence was insufficient because (1) "[n]one of the witnesses corroborate each other," and (2) "[n]o physical evidence corroborates their testimony." Brief of Appellant, p. 36. Although the record supports appellant's claim that the testimony of various witnesses was inconsistent, and even clearly contradictory in certain respects, it is not the function of this Court to resolve inconsistencies in the evidence, and we are not free to substitute our judgment for that of the fact finder. *Commonwealth v. Johnson*, 576 Pa. 23, 37, 838 A.2d 663, 671 (2003). Moreover, it bears particular emphasis that the evidence included the testimony of appellant's brother, Michael Wright, that he himself, along with appellant Wright and appellant Freeland, were all shooting at the armored car on the night Officer Schaad was killed, and fur-

ther described the types of weapons each of them used that day. N.T. March 6, 2003, at pp. 812–815. This evidence alone, when viewed in the light of the governing standards, was certainly sufficient to support the jury's conclusion that appellant was at least an accomplice of the principal who fired the fatal bullet, in accordance with the instructions it was given. Thus, there is no basis upon which to grant Wright relief on his sufficiency challenge.

¶ 23 Appellant Wright next argues that the trial court erred in denying his requests for a change of venue or jury venire. The law governing our consideration of these claims has been well summarized by the Pennsylvania Supreme Court:

"The trial court's decision on appellant's motions for change of venue/venire rests within the sound discretion of the trial judge, whose ruling thereon will not be disturbed on appeal absent an abuse of that discretion." *Commonwealth v. Marinelli,* 547 Pa. 294, 690 A.2d 203, 213 (1997), *cert. denied,* 523 U.S. 1024, 118 S.Ct. 1309, 140 L.Ed.2d 473 (1998); *Commonwealth v. Paolello,* 542 Pa. 47, 665 A.2d 439, 450 (1995). "In reviewing the trial court's decision, our inquiry must focus upon whether any juror formed a fixed opinion of the defendant's guilt or innocence as a result of the pretrial publicity." *Marinelli,* 690 A.2d at 213.

"A change in venue becomes necessary when the trial court concludes that a fair and impartial jury cannot be selected in the county in which the crime occurred." *Commonwealth v. Bridges,* 563 Pa. 1, 757 A.2d 859, 872 (2000), *cert. denied,* 526[535] U.S. 1021[1102], 122 S.Ct. 2306, 152 L.Ed.2d 1061; *Commonwealth v. Karenbauer,* 552 Pa. 420, 715 A.2d 1086, 1092 (1998), *cert. denied,* 526 U.S. 1021, 119 S.Ct. 1258, 143 L.Ed.2d 354 (1999). "Normally, one who claims that he has

been denied a fair trial because of pretrial publicity must show actual prejudice in the empanelling of the jury. In certain cases, however, pretrial publicity can be so pervasive or inflammatory that the defendant need not prove actual juror prejudice." *Bridges,* 757 A.2d at 872 (internal citations omitted). "Pretrial prejudice is presumed if: (1) the publicity is sensational, inflammatory, and slanted toward conviction rather than factual and objective; (2) the publicity reveals the defendant's prior criminal record, or if it refers to confessions, admissions or reenactments of the crime by the accused; and (3) the publicity is derived from police and prosecuting officer reports." *Commonwealth v. Weiss,* 565 Pa. 504, 776 A.2d 958, 964 (2001), *cert. denied,* 535 U.S. 1101, 122 S.Ct. 2303, 152 L.Ed.2d 1059 (2002).

Even where pre-trial prejudice is presumed, "a change of venue or venire is not warranted unless [the defendant] also shows that the pre-trial publicity was so extensive, sustained, and pervasive that the community must be deemed to have been saturated with it, and that there was insufficient time between the publicity and the trial for any prejudice to have dissipated." *Karenbauer,* 715 A.2d at 1092; [*Commonwealth v.*] *Rucci*[, 543 Pa. 261, 670 A.2d 1129 (1996) ] ; *Commonwealth v. Breakiron,* 524 Pa. 282, 571 A.2d 1035, 1037 (1990), *cert. denied,* 498 U.S. 881, 111 S.Ct. 224, 112 L.Ed.2d 179 (1990).

In testing whether there has been a sufficient cooling period, a court must investigate what a panel of prospective jurors has said about its exposure to the publicity in question. This is one indication of whether the cooling period has been sufficient. Thus, in determining the efficacy of the cooling period, a court will consider the direct

effects of publicity, something a defendant need not allege or prove. Although it is conceivable that pre-trial publicity could be so extremely damaging that a court might order a change of venue no matter what the prospective jurors said about their ability to hear the case fairly and without bias, that would be a most unusual case. Normally, what prospective jurors tell us about their ability to be impartial will be a reliable guide to whether the publicity is still so fresh in their minds that it has removed their ability to be objective. The discretion of the trial judge is given wide latitude in this area.

*Commonwealth v. Chambers,* 546 Pa. 370, 685 A.2d 96, 104 (1996), *cert. denied,* 522 U.S. 827, 118 S.Ct. 90, 139 L.Ed.2d 46 (1997) (*citing Breakiron,* 571 A.2d at 1037–1038 n. 1).

*Commonwealth v. Drumheller,* 570 Pa. 117, 132–133, 808 A.2d 893, 902–903 (2002), *cert. denied,* 539 U.S. 919, 123 S.Ct. 2284, 156 L.Ed.2d 137 (2003) (footnote omitted).

¶ 24 Judge Uhler considered all the material offered by appellant at the pre-trial hearing, and concluded that "the way to assess whether defendant Wright [can] have a fair trial in York County is to engage in a thorough *voir dire* of the prospective jury panel regarding the pre-trial publicity to determine whether the community has been so saturated by it."

Slip Opinion, December 30, 2002, Uhler, J., p. 24. Thereafter, more than three months elapsed,[26] before the trial judge, President Judge Chronister, began, on March 3, 2003, an extensive and thorough *voir dire* of the potential jurors, the result of which was the impaneling of a jury of twelve jurors and three alternate jurors who had testified that they had no fixed opinion on the guilt or innocence of the defendants. Upon our review of this record, we detect no basis upon which to conclude that the trial court abused its discretion in denying the motion for change of venue or jury venire. *See: Commonwealth v. Tharp,* 574 Pa. 202, 830 A.2d 519 (2003), *cert. denied,* ⸺ U.S. ⸺, 124 S.Ct. 2161, 158 L.Ed.2d 736 (2004).

▮▮▮ ¶ 25 Appellant Wright's final question is directed to the denial by the trial court of his motion to suppress his grand jury testimony. Wright argues that his rights under the Sixth Amendment were violated because, prior to his testimony before the grand jury, he was advised of his right to counsel and his right to remain silent while in the company of eleven other witnesses who were also scheduled to appear before the grand jury.[27]

¶ 26 The Investigating Grand Jury Act, 42 Pa.C.S. §§ 4541 *et seq.,* does not prohibit a witness from waiving his right to

---

26. It bears mention that in the record certified to this Court, appellant cites no offending articles or news broadcasts that appeared during the three and one half month period leading up to the trial.

27. Appellant, in the argument section of his brief on this issue, suggests that the Commonwealth misled the presiding judge of the grand jury about the potential for Mr. Wright to be a target of the grand jury ("Had the Commonwealth been candid with the court about Mr. Wright's role in the investigation and suggested a more thorough colloquy, the

court may have elected to not permit Mr. Wright to waive his then critical right to counsel." Brief of Appellant Wright at p. 23.). Since the question of the Commonwealth's good faith before the grand jury was not raised as a separate question for review, it is waived. *See:* Pa.R.A.P 2116(a). Moreover, there is no basis upon which to believe that the status of appellant as a potential target would have had an impact on the presiding judge in light of *Commonwealth v. Williams,* 388 Pa.Super. 153, 565 A.2d 160 (1989).

counsel or giving incriminating testimony, provided appropriate warnings have been given. Appellant Wright cites no support for his claim that the warnings had to have been given individually to each witness in order for them to be effective. In fact, the method employed in this case to acquaint witnesses with their rights was the same as was followed in the case of *Commonwealth v. Williams*, 388 Pa.Super. 153, 565 A.2d 160, 163–164 (1989). Moreover, based upon our review of the record, we are satisfied that Judge Uhler, as presiding judge of the grand jury, fully and fairly advised appellant Wright of his constitutional and statutory rights,[28] and there

---

**28.** The transcript of the grand jury, which has been included in the record certified to this Court, reveals the following efforts by the presiding judge to acquaint appellant with his rights:

> THE COURT: ... Permit me to introduce myself. My name is Judge John Uhler. I'm the supervising judge of the county investigating grand jury. I understand each of you have been subpoenaed to appear before the county investigating grand jury. And as witnesses before that grand jury, you are entitled to certain rights and you are subject to certain obligation which I will now explain to you. Each of these rights and duties are equally important and you must fully understand all of them.
> But before proceeding with an explanation of those rights, each of you, when you received the subpoena, were given notice that you have a right to be sworn in publicly and/or privately. And privately would be within the confines of my chambers and your name would not be disclosed publicly of record [as] having been sworn in on a public basis. I ask any of you and if any of you wish to be sworn in privately, I simply request that you raise your hand and remain in the corner to the left of this courtroom, as you're facing it, go over there if you would please, and I will deal with you at a later time. I'll not be disclosing your name.
> I can only assume then that the remainder of those who are not in the far corner are here present for purposes of the subpoena, that you're prepared to go forward with listening to the obligations and duties that the Judge will be instructing you, and that you're prepared to go forward on a publicly sworn basis. Is that correct? Does anyone—do you wish to be sworn in privately?
>
> \* \* \* \*
>
> Having determined those that are remaining in this block wish to be sworn in publicly, sir I'm going to start in the right hand of the courtroom, first row, what is your name please?
>
> \* \* \* \*
>
> MR. WRIGHT: Leon Wright.
>
> \* \* \* \*
>
> THE COURT: ... Let me begin by advising you that you have the right to the advice and assistance of an attorney. This means that you have the right to the services of a lawyer with whom you may consult concerning all matters pertaining to your appearance before the grand jury. You may confer with your lawyer at any time before, during, and after your appearance. You may consult with your lawyer throughout the entirety of the contact with the investigating grand jury and your lawyer may be present with you in the grand jury room during the time that you are actually testifying and you may confer with him or her at that time.
> If you cannot afford a lawyer, you are entitled to the services of a lawyer appointed by the Court, and I would do so. If you are ineligible for a court appointed lawyer and you are not currently represented by an attorney, I would give anyone who so desires that opportunity to secure an attorney a reasonable time to retain one. Does everyone understand those basic rights that I've just discussed? Does anyone not understand? If anyone does not understand, would you please raise your hand? Let the record reflect that no one has indicated that they do no understand.
> If you have not consulted a lawyer before now and do not wish to consult a lawyer at this time, that does not mean that you are barred from seeking to retain a lawyer in the future. Should you decide at any time during the course of your testimony that you want to have legal advice, kindly advise the assistant district attorney [who] will be involved with the grand jury process that you wish to consult with a lawyer. And in that event, the assistant district attorney has been instructed by me to cease any further questioning of you, inasmuch as you've

is no basis upon which to afford him relief on this claim.[29]

sought the right to speak with an attorney. A recess will be granted and you will [be] excused until you have an opportunity to further consult with counsel. Does everyone understand that basic concept? Does anyone not understand that? Let the record reflect no one has indicated that they do not understand and I'll go forward.

You have the right to refuse to answer any question pending a ruling by the Court directing you to respond, if you honestly believe that there are proper legal grounds for that refusal. In particular, you have the right to refuse to answer any question if you honestly believe that the answer may tend to incriminate you. Should you refuse to answer a question, you may offer the reason for that refusal, but you are not obligated to do so. If you answer some questions or begin to answer any particular question, that does not mean that you must thereafter continue to provide answers or even to complete the answer to the question that you've begun. However, any answers that you do give to any question can and may be used against you for the purpose of presentment or criminal prosecution or both. Does everyone understand those basic concepts?

You have a right not to incriminate yourself. You have a right to exercise that privilege not to respond. And if you've begun responding to a question and decide you want to stop, if you honestly believe that the answer may tend to incriminate you, you may stop and invoke your right to stop. Does everyone understand that? Is there anyone that does not understand that? Anyone who does not understand it, would they raise their hand?

Is there anyone present this morning that by virtue of issues such as medication or issues of any other concern which would prevent them from understanding what's going on here this morning? Then I will continue on.

If you are uncertain as to whether or not you may lawfully refuse to answer any question or if any other problem arises during your appearance before the investigating grand jury, you have the right to stop the questioning and to appear before me alone, if you are not represented by counsel, in conjunction with the court reporter and the involved assistant district attorney or with your lawyer for a ruling on that particular matter. Does everyone understand that basic concept? Is there anyone that does not understand that basic concept? If so, please raise your right hand. Does everyone understand these basic rights? Is there anyone that does not understand what I've just gone over and would like further explanation.

As a witness before the county investigating grand jury, you have the duty to give complete, truthful and honest answers to all questions, except those that you have a proper legal basis for refusing to answer.

\* \* \* \*

Are those that have been subpoenaed now prepared to be sworn in or affirmed? Is there anyone that is not prepared? Very well. I'll ask all of those who have identified themselves, particularly ..., Leon Wright, ... to please stand.

N.T. Grand Jury, August 21, 2001, at pp. 2 – 10. This explanation of rights encompasses all the statutory rights set out in section 4549 of the Act, 42 Pa.C.S. § 4549(c). *See generally: Commonwealth v. McCloskey*, 443 Pa. 117, 277 A.2d 764 (1971), *cert. denied*, 404 U.S. 1000, 92 S.Ct. 563, 30 L.Ed.2d 552 (1971). Additionally, the extensive discussion of rights provided to appellant Wright distinguishes this case from those cases relied upon him in his brief (*i.e., Commonwealth v. Vega*, 553 Pa. 255, 719 A.2d 227 (1998); *Commonwealth v. Brazil*, 549 Pa. 321, 701 A.2d 216 (1997); and *Commonwealth v. Payson*, 723 A.2d 695 (Pa.Super.1999)), where the respective trial courts had failed to provide an on-the-record colloquy of the rights that were being surrendered by the respective defendants.

**29.** As for appellant's subsidiary claim that the failure of the grand jury foreman to give him accurate information regarding his right to counsel at the conclusion of his grand jury testimony adversely impacted his knowledge of his constitutional rights, we agree with the following rationale expressed by Judge Uhler in his Opinion in support of his denial of the motion to suppress:

[W]hether or not the foreman's warning was an accurate recitation of the law with respect to grand jury proceedings, ... this Court notes that the foreman's statement to defendant Wright came *after his testimony*. For that reason, logically, the statement

¶ 27 Consequently, finding no meritorious issues in the appeal of Leon Wright we must affirm the judgment of sentence.

### Appeal No. 1282 MDA 2003

¶ 28 Stephen Freeland, in appeal No. 1282 MDA 2003, presents these additional questions for our review: [30]

Whether appellant is entitled to a new trial because the verdict of guilty on the charge of Murder in the Second Degree was against the weight of the evidence?

Whether the trial court erred in admitting into evidence hospital and autopsy photographs of the victim, and allowed the autopsy photograph to go out with the jury during its deliberation?

Whether the trial court erred in refusing to charge the jury on the crime of involuntary manslaughter?

Whether the trial court erred in imposing such a "disparate" sentence on appellant as compared to the co-defendant?

¶ 29 A weight of the evidence challenge is addressed to the discretion of the trial court, and appellate review of a weight claim is a review of the exercise of discretion of the trial court in denying the claim, and not a review of the underlying question of whether the verdict is against the weight of the evidence. *Commonwealth v. Brown*, 538 Pa. 410, 435–436, 648 A.2d 1177, 1189 (1994). Moreover,

because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. *Commonwealth v. Farquharson*, 467 Pa. 50, 354 A.2d 545 (1976). One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice. *Brown, supra.*

*Commonwealth v. Widmer*, 560 Pa. 308, 319–322, 744 A.2d 745, 751–753 (2000). In light of these standards and the summary of evidence previously provided, there is absolutely no basis upon which to fault the trial court's conclusion that:

[T]he testimony of the Commonwealth did establish that a group of black youths fired shots at a vehicle causing a policeman's death, that Leon Wright and Stephen Freeland were among those individuals who fired shots, and that they were at the very least accomplices of the one who fired the shot that killed Henry Schaad.

Slip Opinion, Chronister, P.J., p. 10. This is particularly so since Freeland's defense was based almost entirely upon the jury accepting as credible his testimony that *he*

---

made by the foreman to defendant Wright cannot be deemed responsible for the statements that preceded the warning. Therefore, the erroneous instruction may not provide a basis for suppression of the testimony offered by defendant Wright before the statement made by the foreman.
Slip Opinion, Uhler, J., pp. 31–32 (emphasis in original).
Similarly unavailing is the claim that the use by the Commonwealth of redacted grand jury testimony establishes the prejudice necessary

to find a violation of constitutional rights. The prejudice that may inure to a party who chooses not to invoke his constitutional rights is not a basis upon which to conclude that he was not made aware of those rights. Therefore, since we have already concluded that appellant Wright was adequately advised of those rights, we find no merit to the present attempt to argue that the absence of that information was the cause of the prejudice.

30. *See:* footnote 19, *supra.*

did not fire any weapon at the police vehicle.

¶ 30 Appellant Freeland next complains that the trial court erred in permitting the Commonwealth to introduce into evidence two photographs: a pre-autopsy photograph of the decedent and a picture of the decedent taken while he was still in the hospital. Before addressing this claim, however, we are compelled to remark the certified record does not contain the photographs about which Freeland complains. Thus, we are precluded from reviewing the question of whether the photographs, which are described by the Commonwealth as "black-and-white" photographs,[31] were "gruesome" or "inflammatory", and we limit our review to the issue of whether they were relevant.[32] *See:* Pa.R.E. 401

¶ 31 The admissibility of photographs falls within the sound discretion of the trial court and only an abuse of that discretion will constitute reversible error. *Commonwealth v. Baez*, 554 Pa. 66, 720 A.2d 711, 726 (1998), *cert. denied*, 528 U.S. 827, 120 S.Ct. 78, 145 L.Ed.2d 66 (1999). In exercising that discretion, a trial judge "must determine whether the evidentiary value of the photos outweighs the possibility that they will inflame the minds and passions of the jurors." *Commonwealth v. Begley*, 566 Pa. 239, 268, 780 A.2d 605, 622 (2001).

¶ 32 In this case the rationale of the trial judge in permitting the admission of these photographs was set forth in his Opinion to this Court, as follows:

> [T]he cause of death is an issue in every murder trial, and in this case there was no stipulation regarding the cause of death. Therefore the cause of death was an issue. Further, the [pre-autopsy] photograph depicted the location of the victim's wounds, and was confirmation that he had been struck by bullets fired by the rioters. [It] was not particularly gruesome, and established merely the nature and extent of the victim's injuries.

Slip Opinion, September 29, 2003, Chronister, P.J., pp. 13–14. The judge further concluded that the same considerations warranted the admission of the hospital photograph into evidence. Since the Pennsylvania Supreme Court has stated that the Commonwealth is entitled to utilize photographs to support its case on the cause of death of the victim, *Commonwealth v. Brown*, 551 Pa. 465, 485–486, 711 A.2d 444, 453 (1998), *cert. denied*, 537 U.S. 1187, 123 S.Ct. 1351, 154 L.Ed.2d 1018 (2003),[33] there is no basis upon which to disturb the finding of the trial judge that the photographs in this case were relevant.[34]

---

31. *See generally: Commonwealth v. Freeman*, 573 Pa. 532, 565–566, 827 A.2d 385, 405 (2003), *cert. denied*, —— U.S. ——, 125 S.Ct. 30, 160 L.Ed.2d 31 (2004).

32. Rather than remand this case for the inclusion of the photographs, which is an option under the decision of the Supreme Court in *Commonwealth v. Williams*, 552 Pa. 451, 461–464, 715 A.2d 1101, 1105–1107 (1998), we specifically find that this issue is not waived or finally litigated under 42 Pa.C.S. § 9543(a)(3), and that the issue may be reasserted in a future post conviction petition filed under the Pennsylvania Post Conviction Relief Act.

33. *See also: Commonwealth v. Karenbauer*, 552 Pa. 420, 442, 715 A.2d 1086, 1096 (1998), *cert. denied*, 526 U.S. 1021, 119 S.Ct. 1258, 143 L.Ed.2d 354 (1999), *quoting Commonwealth v. Chester*, 526 Pa. 578, 591, 587 A.2d 1367, 1373 (1991), *cert. denied*, 502 U.S. 959, 112 S.Ct. 422, 116 L.Ed.2d 442 (1991), ("Photographs of a murder victim are not *per se* inadmissible.").

34. Although Freeland, in his statement of questions raised on appeal, claims as an additional error the fact that the pre-autopsy photograph was permitted to go out with the jury, he offers no argument in support of this claim, and we need not separately discuss it.

¶ 33 Freeland next claims that the trial court erred in refusing to instruct the jury on the crime of involuntary manslaughter. Our standard of review of a challenge to the trial judge's instructions to the jury dictates that we are required to defer to the trial judge's choice so long as the law is "clearly, adequately, and accurately presented to the jury." *Commonwealth v. Paddy*, 569 Pa. 47, 91, 800 A.2d 294, 321 (2002). Moreover, a condition precedent to the grant of a request for a jury instruction is evidence of record that supports a verdict on that charge. *See: Commonwealth v. Mayfield*, 401 Pa.Super. 560, 585 A.2d 1069 (1991) (*en banc*) (self-defense).

¶ 34 The statutory offense of involuntary manslaughter occurs when a person causes the death of another person as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner. *See:* Crimes Code of 1939, 18 P.S. 4703 (since re-codified at 18 Pa.C.S. § 2504). Since Freeland's defense was one of his denial of the commission of any acts that could have resulted in Officer Schaad's death, it may not be claimed that he produced evidence of record that would have required the delivery to the jury of an instruction on involuntary manslaughter. *Commonwealth v. Browdie*, 543 Pa. 337, 349, 671 A.2d 668, 674 (1996).

¶ 35 Finally, appellant Freeland contends that the trial judge erred in the "disparate" sentence imposed in this case. Since the sentence imposed in this matter was well within allowable statutory maximum, his argument rests upon a challenge to the discretionary aspects of the sentence. An appeal challenging the discretionary aspect of a sentence is not an appeal of right. Rather, an appellant seeking to raise that issue must seek permission from this Court to appeal and must establish that a substantial question exists on the record that the sentence was not appropriate under the Sentencing Code. *Commonwealth v. Mouzon*, 571 Pa. 419, 435, 812 A.2d 617, 627 (2002); *Commonwealth v. Tuladziecki*, 513 Pa. 508, 515, 522 A.2d 17, 20 (1987); 42 Pa.C.S. § 9781(b); Pa.R.A.P. 2119(f). Since appellant Freeland has not complied with this requirement, and since the Commonwealth has specifically objected to this omission, this Court must regard the issue as waived. *See: Commonwealth v. Archer*, 722 A.2d 203, 211 (Pa.Super.1998).[35]

---

*See: Commonwealth v. Bavusa*, 574 Pa. 620, 636–637, 832 A.2d 1042, 1052 (2003); *Commonwealth v. Irby*, 700 A.2d 463 (Pa.Super.1997).

**35.** It bears mention that the trial judge, in the opinion he filed in support of the sentence, offered the following rationale to support his choice of different sentences for the two individuals:

> The Court gave Freeland a longer sentence for two reasons. First, Freeland was the one who shot the "big gun", a heavy caliber rifle that was capable of penetrating the armored vehicle in which Henry Schaad was riding. *Therefore, he was the one who fired the fatal bullet.* That alone would be a sufficient basis for giving him approximately twice as much time as Leon Wright.

> In addition, since the time of the shooting in 1969 Freeland has been continuously involved in trouble with the law, and is currently serving a state prison sentence. By contrast, *Wright was firing a pistol which was not capable of penetrating the armored vehicle. Therefore he could not have fired the fatal shot.* Further, Wright has not been in trouble for the past thirty years. Therefore there was a significant difference in the prior criminal record of Freeland which also justified his longer sentence.

Slip Opinion, September 29, 2003, Chronister, P.J., pp. 15–16 (emphasis added). As we have carefully analyzed and discussed, however, the evidence presented by the Commonwealth could not support the conclusion of the trial court that appellant Freeland was the

¶ 36 Consequently, finding no meritorious issues in the appeal of Stephen Freeland, we must affirm the judgment of sentence.

¶ 37 Judgment of sentence in appeal No. 1203 MDA 2003 is affirmed.

¶ 38 Judgment of sentence in appeal No. 1282 MDA 2003 is affirmed.

¶ 39 ORIE MELVIN, J., concurs in the result.

source of the fatal shot, since it was impossible to discern from the evidence the identity of the weapon that discharged it. Consequently, the trial court could not validly rely upon the finding that Freeland fired the weapon that discharged the fatal bullet, and that issue may yet be raised under the aegis of the Pennsylvania Post Conviction Relief Act.