J-A06013-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KEVIN DAVID THOMPKINS | : | |
| | : | |
| Appellant | : | No. 706 WDA 2020 |

Appeal from the Judgment of Sentence Entered February 25, 2020
In the Court of Common Pleas of Blair County Criminal Division at No(s):
CP-07-CR-0002180-2018

BEFORE: BENDER, P.J.E., LAZARUS, J., and McCAFFERY, J.

MEMORANDUM BY BENDER, P.J.E.: **FILED: JUNE 3, 2021**

Kevin David Thompkins ("Appellant") appeals from the judgment of sentence of an aggregate term of 23 to 46 years' imprisonment, imposed after he was convicted of rape by forcible compulsion, involuntary deviate sexual intercourse by forcible compulsion, aggravated assault, strangulation, criminal trespass, terroristic threats, unlawful restraint, false imprisonment, simple assault, recklessly endangering another person, and indecent assault by forceful compulsion.[1] Appellant alleges the verdict is against the weight of the evidence and challenges the trial court's denial of his request for a mistrial. Appellant also asserts that his sentence is manifestly excessive and an abuse of the trial court's discretion. After careful review, we affirm.

---

[1] 18 Pa.C.S. §§ 3121(a)(1), 3123(a)(1), 2702(a)(1), 2718(a)(1), 3503(a)(1), 2706(a)(1), 2902(a)(1), 2903(a), 2701(a)(1), 2705, and 2126(a)(2), respectively.

The trial court did not provide a summary of the facts adduced at Appellant's jury trial in either of its Pa.R.A.P. 1925(a) opinions issued in this matter. Thus, we reproduce the Commonwealth's factual summary of the events that led to Appellant's convictions.

On November 1, 2018, Ann Myers, 46 years old, stayed at a motel. The same day, she went to a bar. Between 5 p[.]m[.] and 9 p[.]m[.] in the evening of the same day, she was contacted by [Appellant], an individual known to her, who requested to accompany her to another bar. She refused, which angered [Appellant] and established [his] motive to retaliate. As Ms. Myers was heading back from the bar towards her motel room, she stopped her vehicle at [a] red light, at which time, her vehicle got hit by [Appellant's] car.

Ms. Myers attempted to drive an alternate route to evade [Appellant and] to return to her motel. However, as [she] was attempting to close the door of her motel room, [Appellant] appeared behind her and put his foot in the doorway and then grabbed [a]hold of her and pushed her on the bed inside the room. In an attempt to subdue [her], [Appellant hit her in the face with] a taser (not the electric part) …. While hitting [her], [Appellant] kept repeating, "Do you want this? Do you want this?" After securing a hold of the victim with physical violence and a threat of employing a taser, [Appellant] started strangling [her]. [Ms. Myers] testified to being unable to breathe to the point that she had to start hitting her bed to obtain access to air. Believing that her life [was] at risk, [she] pretended to lose consciousness in hopes that [Appellant] would stop the crime. However, that only incited the nefarious … and vicious ill will of [Appellant] and formed in [Appellant's] mind the motive to obtain a carnal knowledge of the victim by involuntarily inserting his penis into the vagina of the victim. [Ms. Myers] described the strangulation simultaneously occurring with her rape as an act "of squeezing [her] life … out of [her]." [Appellant] then proceeded to penetrate the victim's anal cavity with a finger splint, as well as inserted [*sic*] his penis in the victim's mouth about 2 to 3 times while exclaiming, "do what daddy says." The victim also testified to knowing that [Appellant] had a pocket knife on him. At the conclusion of the act, [Appellant] removed [Ms. Myers's] keys and her phone[,] as well as used physical force[,] to keep [her] from

- 2 -

escaping and from reporting to [the] police. [Ms. Myers] testified that she urinated on herself due to the inability to stand up from the bed caused by [Appellant]. [She] testified that while being raped, strangled[,] and assaulted[,] she kept praying to God that her kids would not end up receiving a call that their mother [was] found dead in a [m]otel.

The … assault continued for hours through the night. [Appellant] then demanded money from [Ms. Myers], which allowed [her] an opportunity to get the keys to her car from [Appellant], and pretend to go to her parked car outside to retrieve money from her wallet, while [Appellant] watched her. When [she] felt she could escape, she drove directly to a Sheetz store [that] she knew would be open at 5 a.m., at which point she entered the store, immediately approached the counter, and asked the cashiers to call [the] police.

While at the Sheetz store, a store clerk observed Ms. Myers who was very loudly and frantically asking for someone to call [the] police[,] as she needed help; she appeared scared as if someone was going to "come get her," upset, distressed, and was constantly moving.

[Ms. Myers] described the numerous injuries she sustained as a result of [Appellant's] conduct: bruising on [her] chin, discoloration of [her] cheeks, [which she stated] turned into black and blue colors, as well as injuries to her neck. [She] testified that as a result of her injuries, she could not swallow without pain for at least 2 to 3 weeks and wasn't … able to catch her breath, and [she] continues to experience severe anxieties. [She also] testified to the severe psychological trauma, which she described as devastating to her life. She further characterized that as a result of [Appellant's] crime, Ms. Myers now cannot form a loving and caring relationship as her life has changed upside down. Ms. Myers testified that she never agreed to have sex with [Appellant], never asked for any sex, [and] never wanted to engage in a relationship or intimate intercourse with [Appellant] that night.

Commonwealth's Brief at 5-8 (unnecessary capitalization and citations to record omitted).

At trial, Appellant presented a far different version of events. Appellant's Brief at xiii. He claimed to have met Ms. Myers in August of 2018.

She was a long-haul truck driver, and he was in the process of obtaining his CDL. *Id.* He claims that Ms. Myers told him she was an instructor for a driver training program with the trucking company she worked for, and she offered to take him on an upcoming trip. He stated that she even offered to pay him $500 per week for his company and that he accepted. *Id.* After Ms. Myers' obtaining authorization from her trucking company, Appellant asserts that he accompanied her on two trips, during which they began a sexual relationship. *Id.* Upon their return from the trips, he stated he discovered that "the trucking company did not in fact have a training program and that Ms. Myers had fabricated the entire thing." *Id.* Appellant confronted her about the lie, but stated that they remained friends, and that they would occasionally "meet up for drinks and sex" when she was in town. *Id.*

Appellant's version of the events that transpired on the night in question was as follows:

> On the night of November 1, 2018, [Appellant] stated that he received multiple calls and texts from Ms. Myers stating that she was in town and asking him to come meet her at the bar. She claimed to have some money she still owed him from their earlier trips that he had long since given up on. He eventually agreed to meet her. By the time [Appellant] arrived at the bar, Ms. Myers was already in her car. They had been speaking on the phone as he drove from Gallitzin to Altoona. She told him to follow her back to the Motel 6. While stopped at a traffic light, [Appellant] gently bumped the back of [her] car, then pulled around in front of her as they proceeded to the motel. They parked next to each other and entered the motel room.
>
> They sat at the small table, [Appellant] pulling up a cooler to sit on as there was only one chair. Ms. Myers began drinking from a bottle of fireball whiskey. Mr. Thompkins was not drinking due to a serious table saw injury to his finger the previous day which

- 4 -

required antibiotics and thick bandaging. They engaged in small talk[,] and Ms. Myers suggested that [Appellant] come out on the road with her again. He declined. After some time, [Appellant's] hand started throbbing[,] so he went over to the bed and laid down. Soon thereafter, Ms. Myers asked if he wanted to have sex and he agreed. She came over to the bed and began to perform oral sex on him before transitioning to vaginal sex at her request. After, they went to sleep for a short time. Around 4:30 the next morning, [Appellant] woke up. Ms. Myers was just waking up as well. She again asked [him] to go out on the road with her. He refused, reminding her that she still owed him money from the first two trips. She pleaded with him, insisting that she would have the money. She asked him to leave his longtime girlfriend and be with her instead. When he made it clear that was not ever going to happen[,] she became upset and tearful. [Appellant] got dressed and left the motel room. He was shocked and confused when [the] police arrested [him] the following day.

*Id.* at xiv-xv.

Appellant was arrested and charged with rape by forcible compulsion, involuntary deviate sexual intercourse by forcible compulsion, burglary of an occupied structure adapted for overnight accommodation, aggravated assault (attempting to cause serious bodily injury), strangulation during a sexual assault, criminal trespass, terroristic threats, unlawful restraint, false imprisonment, simple assault (attempting to cause bodily injury), simple assault by physical menace, recklessly endangering another person, and indecent assault. *See id.* at ix. Appellant's trial commenced on December 9, 2019. On December 11, 2019, after the conclusion of the three-day trial, "the jury returned a guilty verdict on all counts, with the exception of the charge of burglary and the sexual violence component of the charge of strangulation, convicting only of strangulation without sexual violence." *Id.*

The trial court ordered a pre-sentence investigation ("PSI"), sentencing memorandums, and the production of the Sentencing Guidelines prior to sentencing. Trial Court Opinion ("TCO I"), 8/19/20, at 3. A sentencing hearing was conducted on February 25, 2020. After hearing testimony from Daneen Hoover, Appellant's paramour and mother of his children, and from Appellant, and taking into consideration the arguments made by counsel for each party, Appellant was sentenced to 23 to 46 years' imprisonment, followed by 15 years' probation. *Id.* Subsequently,

> Appellant filed a timely[,] omnibus post-trial motion on March 6, 2020, claiming that the verdict was against the weight of the evidence and requesting the court modify his sentence. He also sought additional time to file supplemental motion(s) after the completion of the trial transcripts, which the court granted by order dated March 19, 2020. Upon the court's receipt of notice that the transcripts were completed on May 4, 2020, an order directed any supplemental post-trial motions be filed on or before June 3, 2020. On June 3, 2020, [Appellant] filed a supplemental motion for new trial, reiterating his position that the verdict was against the weight of the evidence and seeking a new trial. This court issued an order denying the omnibus post-trial motion and the supplemental motion for new trial by opinion dated June 9, 2020….[2]

*Id.* (unnecessary capitalization omitted).

On July 8, 2020, Appellant filed a timely notice of appeal, followed by a timely, court-ordered Pa.R.A.P. 1925(b) concise statement of matters complained of on appeal. Herein, Appellant presents the following issues for our review:

---

[2] *See* Trial Court Opinion ("TCO II"), 6/9/20.

1. Whether the interests of justice entitle [Appellant] to a new trial[,] as the jury's verdict was against the weight of the evidence such that it effectively shocked the conscience[?]

2. Whether the [t]rial [c]ourt abused its discretion when it denied [Appellant's] request for a mistrial on the grounds that the Commonwealth deliberately elicited inadmissible testimony that was so prejudicial that it prevented the jury from weighing and rendering a true verdict[?]

3. Whether the sentencing court committed an abuse of discretion by running the sentences on each count consecutively, creating an aggregate sentence that is manifestly unreasonable[?]

Appellant's Brief at viii.

Our standard of review for evaluating a weight-of-the-evidence claim is well-established:

When the challenge to the weight of the evidence is predicated on the credibility of trial testimony, our review of the trial court's decision is extremely limited. Generally, unless the evidence is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, these types of claims are not cognizable on appellate review. Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

***Commonwealth v. Gibbs***, 981 A.2d 274, 282 (Pa. Super. 2009) (citations omitted). "A true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed." ***Commonwealth v. Charlton***, 902 A.2d 554, 561 (Pa. Super. 2006) (citation omitted). Therefore, "[a]n appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of

- 7 -

the evidence," as the trial judge is in the best position to view the evidence presented. *Id.* (quoting *Commonwealth v. Wright,* 865 A.2d 894, 915 (Pa. Super. 2004)). Moreover, "it is for the fact-finder to make credibility determinations, and the finder of fact may believe all, part, or none of a witness's testimony." *Gibbs*, 981 A.2d at 282 (citation omitted).

Instantly, Appellant asserts that the majority of the evidence against him was supplied by Ms. Myers and that her "behavior throughout the trial[,] as well as her numerous inconsistent statements[,] rendered her a uniquely unreliable witness." Appellant's Brief at xvi ¶1. He claims that his conviction, based on "such threadbare evidence[,] shocks the conscience and denies justice." *Id.* In fact, Appellant argues, "[n]o reasonable person could find Ms. Myers' testimony to be credible in its entirety." *Id.* at 2. Appellant's weight challenge is based primarily on alleged inconsistencies in Ms. Myers' testimony and his opinion that she was not a credible witness. *See id.* at 2-8. However, his attacks on her credibility have no merit.

It is well-settled that "the jury [is] the ultimate fact-finder and the sole arbiter of the credibility of each of the witnesses." *Commonwealth v. Jacoby*, 170 A.3d 1065, 1080 (Pa. 2017). "[I]nconsistencies in eyewitness testimony are not sufficient to warrant a new trial on grounds that the verdict was against the weight of the evidence." *Id.* at 1081 (citation omitted). "Issues of witness credibility include questions of inconsistent testimony and improper motive." *Id.* (citation omitted). "A jury is entitled to resolve any inconsistencies in the Commonwealth's evidence in the manner that it sees

fit." *Id.* (citation omitted). Additionally, "the uncorroborated testimony of a sexual assault victim, if believed by the trier of fact, is sufficient to convict a defendant, despite contrary evidence from defense witnesses." *Charlton*, 902 A.2d at 562 (citation omitted).

To the extent that Appellant points to self-serving, contradictory evidence presented at trial,[3] and essentially asks this Court to re-weigh the evidence, we note that this is beyond our scope of review. *See Commonwealth v. Talbert*, 129 A.3d 536, 546 (Pa. Super. 2015). "The jury, as finder of fact, had the duty to determine the credibility of the testimony and evidence presented at trial." *Id. See also Commonwealth v. Collins*, 70 A.3d 1245, 1251 (Pa. Super. 2013) (stating that "[a]n appellate court cannot substitute its judgment for that of the finder of fact[]"). Here, the jury was free to believe Ms. Myers' testimony and to disbelieve that of Appellant. Likewise, it was free to resolve any inconsistencies in the evidence in the manner which it saw fit. *See Jacoby*, *supra*.

The trial court explained its denial of Appellant's motion for a new trial as follows:

> A trial judge, in reviewing a claim that the verdict is against the weight of the evidence[,] does not sit as the thirteenth juror.

---

[3] For instance, Appellant references the testimony of Jamie Weigand, the nurse who performed the sexual assault examination on Ms. Myers. *See* Appellant's Brief at 3-4 (citing N.T. Trial, 12/10/19, at 93-94). Ms. Weigand admitted that the documentation of her examination contained no indication of genital injuries, bruising, irritation, redness, or tenderness. *Id.* We note, however, that Ms. Weigand also testified that Ms. Myers could not sit on the examination table, because "it hurt so bad." N.T. Trial, 12/10/19, at 22.

Rather, the role of the trial judge is to determine that[,] "notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." **Helpin v. Trustees of University of Pennsylvania**, 969 A.2d 601, 616 (Pa. Super. 2009) (citing [**Commonwealth v.**] **Widmer**, [744 A.2d 745, 751-52 (Pa. 2000)]). While [Appellant] may believe the victim's testimony was "unreliable, inconsistent and untruthful[,]" there is certainly a basis for the jury to find otherwise. In fact, the jury acquitted [Appellant] of the burglary charge and also made a finding on the grading of the strangulation charge[,] leading this court to conclude that they were able to evaluate *all* of the evidence and follow the law in reaching decisions resulting in their verdicts. After consideration of [Appellant's] motions and the entirety of the trial record in conjunction with the applicable law, we decline to find that the jury verdicts were against the weight of the evidence and[,] therefore, also deny [Appellant's] request for a new trial.

TCO II at 3-4 (unnecessary capitalization omitted; emphasis in original). We agree with the trial court that the verdict is not so contrary to the evidence as to shock the conscience. Thus, we conclude that the trial court did not abuse its discretion in denying Appellant's weight-of-the-evidence claim.

Next, Appellant avers that the trial court abused its discretion in denying his request for a mistrial on the grounds that "the Commonwealth deliberately elicited inadmissible testimony that was so prejudicial … it prevented the jury from weighing and rendering a true verdict." Appellant's Brief at 11. In reviewing this claim, we remain mindful of the following:

The decision to declare a mistrial is within the sound discretion of the court and will not be reversed absent a "flagrant abuse of discretion." **Commonwealth v. Cottam**, … 616 A.2d 988, 997 ([Pa. Super.] 1992); **Commonwealth v. Gonzales**, … 609 A.2d 1368, 1370-71 ([Pa. Super.] 1992). A mistrial is an "extreme remedy … [that] … must be granted only when an incident is of such a nature that its unavoidable effect is to deprive [the] defendant of a fair trial." **Commonwealth v. Vasquez**, … 617

- 10 -

A.2d 786, 787-88 ([Pa. Super.] 1992) (citing **Commonwealth v. Chestnut**, … 512 A.2d 603 ([Pa.] 1986)[,] and **Commonwealth v. Brinkley**, … 480 A.2d 980 ([Pa.] 1984)). A trial court may remove taint caused by improper testimony through curative instructions. **Commonwealth v. Savage**, … 602 A.2d 309, 312-13 ([Pa.] 1992); **Commonwealth v. Richardson**, … 437 A.2d 1162 ([Pa.] 1981). Courts must consider all surrounding circumstances before finding that curative instructions were insufficient and the extreme remedy of a mistrial is required. **Richardson**, … 437 A.2d at 1165. The circumstances which the court must consider include whether the improper remark was intentionally elicited by the Commonwealth, whether the answer was responsive to the question posed, whether the Commonwealth exploited the reference, and whether the curative instruction was appropriate. **Id.**

**Commonwealth v. Stilley**, 689 A.2d 242, 250 (Pa. Super. 1997), *abrogated on different grounds*, **Commonwealth v. Butler**, 812 A.2d 631 (Pa. 2002).

The testimony at issue in the instant matter was the following discourse between the Commonwealth and Ms. Weigand regarding her forensic examination of Ms. Myers:

[Commonwealth]: What physical manifestations did you observe during that visual examination of [Ms. Myers] that supported the strangulation?

[Ms. Weigand]: She had what appeared to be fingerprints on the right side of her neck and she had a large amount of swelling to the left side of her neck. She also had some bruising to her cheek. And further on in the exam when we were looking inside of her frenulum[,] which would be the upper part between your teeth and your gums, she had some petechiae that is indicative of a strangulation type of injury.

[Commonwealth]: Can you explain to the jury what petechiae is?

[Ms. Weigand]: Petechiae is that your body uses hemoglobin and so when the little capillaries—so for instance when someone is being strangled, the

- 11 -

> capillaries themselves are starving for oxygen and they disrupt and then that is what gives so petechiae are tiny little wee bruises. They can either [be] blue or red in color and they are tiny little spots.

[Commonwealth]: And you indicated that the location of the particular petechiae were significant to you to support the strangulation?

[Ms. Weigand]: Correct.

N.T. Trial, 12/10/19, at 23-24.

Appellant argues that Ms. Weigand, who had not been accepted as an expert witness and was testifying as a layperson, was prohibited from offering her opinion as to the significance of observing petechiae on Ms. Myers' frenulum. Appellant's Brief at 13 (citing Pa.R.E. 702(a) (providing that expert testimony is permitted where the witness's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson)). Nonetheless, Appellant asserts that the prosecutor specifically asked Ms. Weigand to "educate the jury on the subject." *Id.* Despite the fact that the trial court sustained defense counsel's objection to the admission of this evidence and ordered Ms. Weigand's testimony regarding the formation of petechiae be stricken from the record, *id.* (citing N.T. Trial, 12/10/19, at 48), Appellant claims that he was prejudiced, as the jury had already heard her testimony. *Id.* More specifically, he alleges:

> First, Ms. Weigand's training and experience had not been examined and thus she had not demonstrated that she was qualified to render an opinion on the subject. Second, the medical reports made no mention of the presence of petechiae and[,] thus[, Appellant] was not prepared to challenge or refute the soundness of Ms. Weigand's opinion by means of either cross-

- 12 -

examination or a defense expert. Finally, if the jury were to accept Ms. Weigand's opinion as true, it would effectively destroy [Appellant's] defense that Ms. Myers'[] injuries were self-inflicted.

*Id.* at 13-14. Additionally, Appellant asserts that not only was the testimony elicited by the Commonwealth, but that this was a deliberate attempt on the part of the Commonwealth to prejudice the jury with inadmissible testimony. *Id.* at 17. As a result, Appellant claims he was denied a fair trial and that, in denying his request for a mistrial, the trial court failed to account for the "significant prejudice" that the testimony caused him. *Id.* at 20, 21-22.

After a lengthy discussion outside the presence of the jury regarding the admissibility of Ms. Weigand's testimony, the trial court addressed the jury as follows:

> So[,] from time to time[,] there are things that we need to hear outside your presence and … it was just easier to put you in a deliberation room while we took care of those matters. The [c]ourt has made a ruling. You heard this witness testify to petechiae in the frenulum of Ms. Myers['] mouth and the same being indicative of strangulation. The [c]ourt has ruled this evidence inadmissible. In other words, you are not to consider that portion of the testimony and you are to disregard it.

N.T. Trial, 12/10/19, at 63-64.

Appellant argues that the court's "bare instruction" to simply disregard this portion of Ms. Weigand's testimony, without providing the jury with an explanation as to why the evidence is inadmissible, was insufficient to cure its prejudicial effect. Appellant's Brief at 19. In fact, Appellant suggests that the jury was "incapable" of disregarding the testimony. *Id.* He stresses that, "[r]ather than mitigate the prejudice, the [c]ourt's repetition of the prejudicial

statement in the curative instruction focused the jurors' attention on [the] most prejudicial aspect of it, firmly fixing it in the minds of the jury and increasing its prejudicial effect." *Id.* at 19-20. Appellant is not entitled to relief on this claim.

First, as to his suggestion that the jury was incapable of ignoring the stricken testimony, "[i]t is well settled that juries are presumed to follow the instructions of a trial court to disregard inadmissible evidence." *Commonwealth v. Manley*, 985 A.2d 256, 268 (Pa. Super. 2009). *See also Commonwealth v. Jones*, 668 A.2d 491, 504 (Pa. 1995) (declaring that the jury is presumed to follow cautionary instructions from the court). Moreover, we deem the trial court's instruction to be clear and specific as to the portion of Ms. Weigand's testimony that the jury was required to disregard. *See Commonwealth v. Thompson*, 106 A.3d 742 (Pa. Super. 2014) (stating that the trial court's curative instructions must be clear and specific, and that the court must instruct the jury to disregard the improper evidence). Since the trial court properly instructed the jury to disregard Ms. Weigand's testimony that she observed petechiae on Ms. Myers' frenulum, and that it was indicative of strangulation, we presume that the jury followed the court's instructions in reaching its verdict.

In response to Appellant's claims regarding the prejudicial effect of the jury's having heard Ms. Weigand's testimony, and his being deprived of a fair trial as a result of the trial court's denial of his request for a mistrial, the court opined:

- 14 -

In denying the mistrial, this court did not find that the response was elicited by the Commonwealth in an effort to violate [Appellant's] constitutional right to a fair trial or to overreach. The jury had already heard about the physical manifestations to the victim's neck (red marks, swelling, bruising) from several other pieces of evidence/testimony, including [Ms. Myers], Jennifer F[o]wler (paramedic), a layperson (Sheetz employee)[,] and [it had] watched the body cam interview of Officer Talamo. [Ms. Myers] testified that she was strangled with "his hands around her neck" and he "straddled her." She told the jury that she was not able to breathe. He squeezed harder and she kept "hitting the bed trying to get her breath." [Ms. Myers] testified that … Appellant did this for hours and applied pressure of "100" on a scale of 1 to 10. She also described that his hands were on her neck during a "couple" of the sexual assaults, "squeezing my life, my breath out of me[."] [She] recalled that the paramedics tried putting a collar around her neck, but she could not comply because of all the choking by … Appellant. On cross examination, [Ms. Myers] testified that … Appellant grabbed her by the throat. Also, in response to cross-examination, [she] stated that … Appellant pushed her onto the bed and started to strangle her. During the assault, … Appellant demanded money[,] according to [Ms. Myers]. He would demand the money and grab her throat, lifting her off the ground. [Ms. Myers] consistently said that … Appellant raped her, choked her[,] and strangled her "for hours." She described losing her breath on multiple occasions due to being choked. [She] told the jury that when she got away from [Appellant,] she went to Sheetz to obtain help. Brenda Rhinehart, a Sheetz employee, who encountered [Ms. Myers,] testified that she saw red marks on the victim's neck and arms. The jury saw the police officer's body cam and heard [Ms. Myers] tell the police officers that she could not lift her neck because it was painful, as a result of being choked. Jennifer Fowler, the treating paramedic, testified that she saw red marks that looked like handprints on her throat which were raised[,] and some swelling on the one side. Ms. Fowler corroborated [Ms. Myer's] testimony relative to the introduction of a c-spine collar for stabilization of the neck. She further told the jury that the victim had an adverse reaction to the request to place a medical collar around her neck. Therefore, … Appellant is simply incorrect when saying that the inadmissible response "provided some of the only objective evidence of [his] guilt that did not rely on the alleged victim's credibility."

TCO I at 9-11 (unnecessary capitalization and citations to the record omitted).

The trial court also rejected Appellant's argument that he was denied the opportunity to consult with an expert:

> First, the elements of strangulation do not require physical injury. Second, the defense strategy did not change by this one passing reference of petechiae from Ms. Weigand. A viable defense strategy was that the victim could have caused the injuries to herself, which strategy remained intact after the ruling. The defense had the ability to hire an expert to determine if the manifestations on [Ms. Myers'] body could have been self-inflicted. The defense had all of the information from the rape kit, including the twelve[-]page document with the [sexual assault forensic examiner's] notes and the photos. The defense did not separately conduct an interview of the nurse to determine if an expert was necessary.

*Id.* at 11 (unnecessary capitalization and citations to the record omitted).

In conclusion, the trial court noted that "[t]he instant matter and the circumstance leading to the mistrial request are a sharp contrast to matters such as ***Commonwealth v. Durant***, 407 A.2d 1311 (Pa. Super. 1979), wherein a Commonwealth witness on cross-examination purposefully volunteered the defendant's previous incarceration in an effort to poison the jury." *Id.* at 11-12. It observed that the ***Durant*** Court determined that the remarks were not curable with an instruction to the jury and deemed the trial court's failure to grant a mistrial reversible error. *Id.* at 12 (citing ***Durant***, 407 A.2d at 1312). We agree with the trial court that "[f]or all of the reasons set forth above, any possible taint that the single reference to petechiae created at that point in the proceeding was cured by the [c]ourt's instruction to disregard the same as inadmissible." *Id.* Moreover, "[a]ll available defenses remained intact and[,] thus, [Appellant] was not deprived of a fair

trial." ***Id.*** Accordingly, we discern no abuse of discretion in the trial court's denial of Appellant's request for a mistrial.

Finally, Appellant claims that his sentence is manifestly excessive and unreasonable. Appellant's Brief at 22. While he concedes that the trial court sentenced him within the standard guideline ranges on each count, ***see id.*** at xvi, he claims that "the court's imposition of multiple sentences [to run] consecutively to each other illustrates a flagrant disregard for the nature and circumstances of [his] criminal history." ***Id.*** at 23. Appellant's allegations relate to the discretionary aspects of his sentence.

> Challenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right. An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test:

>> We conduct a four-part analysis to determine: (1) whether [the] appellant has filed a timely notice of appeal, ***see*** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, ***see*** Pa.R.Crim.P. 720; (3) whether [the] appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.[] § 9781(b).

> Objections to the discretionary aspects of a sentence are generally waived if they are not raised at the sentencing hearing or in a motion to modify the sentence imposed.

***Commonwealth v. Moury***, 992 A.2d 162, 170 (Pa. Super. 2010) (citations and internal quotations omitted).

Here, the record clearly reflects that Appellant filed a timely notice of appeal, properly preserved his claim in his post-sentence motion, and included

a separate, concise Rule 2119(f) statement in his appellate brief. Thus, we proceed to determine whether Appellant has raised a substantial question to meet the fourth requirement of the test outlined above.

Instantly, Appellant recognizes that an excessive sentencing claim based on the imposition of consecutive rather than concurrent sentences does not automatically raise a substantial question. Appellant's Brief at xix. Nevertheless, he asserts that the court's imposition of consecutive sentences resulted in an aggregate sentence of 23 to 46 years' incarceration for convictions that stemmed from a single incident, and that because of his age, he will likely remain incarcerated for the rest of his life. *Id.* at 23-24. Moreover, Appellant argues that his aggregate sentence "suggests an unjustifiable concern for public safety stemming from a single event coupled with an outright rejection of any of the mitigating factors presented by defense counsel." *Id.* at 24. He suggests that the trial court failed to consider that his criminal history was decades old and that its reference to his "history of assaultive behavior" during sentencing portrays Appellant "as a man who has both squandered any opportunity for rehabilitation and has remained, throughout his life, a violent menace to society[,]" which he claims is "simply not accurate[.]" *Id.* at 23.

As we explained in *Commonwealth v. Dodge*, 77 A.3d 1263 (Pa. Super. 2013),

> [a] defendant *may* raise a substantial question where he receives consecutive sentences within the guideline ranges if the case involves circumstances where the application of the guidelines

- 18 -

would be clearly unreasonable, resulting in an excessive sentence; however, a bald claim of excessiveness due to the consecutive nature of a sentence will not raise a substantial question.

In determining whether a substantial question exists, this Court does not examine the merits of whether the sentence is actually excessive. Rather, we look to whether the appellant has forwarded a plausible argument that the sentence, when it is within the guideline ranges, is clearly unreasonable. Concomitantly, the substantial question determination does not require the court to decide the merits of whether the sentence is clearly unreasonable.

*Id.* at 1270 (internal citations and footnote omitted; emphasis in original).

Additionally, this Court has held that "an excessive sentence claim—in conjunction with an assertion that the court failed to consider mitigating factors—raises a substantial question." ***Commonwealth v. Caldwell***, 117 A.3d 763, 770 (Pa. Super. 2015) (internal quotation marks and citations omitted).

Based on our review of the foregoing precedents, we conclude that Appellant's challenge to the imposition of his consecutive sentences as unduly excessive, together with his claim that the court failed to consider the nature and circumstances of his criminal history, presents a substantial question. Thus, we proceed to examining the merits of his sentencing claim.

When reviewing a challenge to the discretionary aspects of a sentence, we determine whether the trial court has abused its discretion. *Id.* at 771.

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its

- 19 -

judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

***

When imposing a sentence, a court is required to consider the particular circumstances of the offense and the character of the defendant. In particular, the court should refer to the defendant's prior criminal record, his age, personal characteristics and his potential for rehabilitation. Where the sentencing court had the benefit of a [PSI], we can assume the sentencing court was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors. Further, where a sentence is within the standard range of the guidelines, Pennsylvania law views the sentence as appropriate under the Sentencing Code.

*Commonwealth v. Griffin*, 65 A.3d 932, 935-36 (Pa. Super. 2013) (internal

citations and quotation marks omitted).

The record belies Appellant's assertions that his aggregate sentence is

manifestly excessive and unreasonable, and that the trial court failed to

consider mitigating factors. As the trial court so aptly summarized:

[Appellant] was provided notice of why and how the court was fashioning his sentence at the time of the sentencing hearing and [the court] also referenced those considerations in [its] sentencing order of February 25th. This jurist readily acknowledged at the sentencing hearing and in the sentencing order that the [PSI] was considered and made part of the record, as was all mitigating information offered for [Appellant]. The court considered the fact that [Appellant] was out of jail, awaiting trial for seven (7) months while on pre-trial services and[,] further[,] that during his time in jail he had earned certificates of achievement for his participation in jail programs. The court heard from the mother of his children and his partner that he was a good provider for their family. The court also considered [Appellant's] statements[,] including remarks about his work history, that this incident was not representative of who he is, and that his family needed him. The undersigned also viewed the public safety in determining an appropriate sentence for [Appellant]. Specifically, the court explained that the nature of his criminal actions evidenced a need to protect society. This was a brutal sexual attack, which lasted

for hours. It involved more than one type of sexual and physical assault for which the court found in its discretion required accountability and sanctions for each act. [Appellant's] prior assaultive behavior was noted, as well as his prior opportunities for rehabilitation. This court notes that the sentences imposed in this case were all consistent with the standard range of the Pennsylvania Sentencing Guidelines.

TCO II at 5 (unnecessary capitalization omitted). Moreover, the court stated in its sentencing order: "The consecutive nature of this sentence is further justified by the significant impact of the crimes upon the victim, [Appellant's] lack of remorse[,] and quite frankly, [that] the [c]ourt does not believe [Appellant] is entitled to a volume discount for his criminal behavior…. [E]ach act requires accountability." Order, 2/25/20, at 5 (unpaginated). Appellant "employed humiliating acts upon the victim[,] where he not only physically and sexually assaulted her, [but] he [also] terrorized her." *Id.*

After careful review of the record, we are satisfied that the trial court gave appropriate consideration to the relevant factors before issuing Appellant's sentence, and we ascertain no abuse of discretion.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/3/2021

- 21 -