J-A05044-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| STEVEN OLIEMULLER | : | |
| | : | |
| Appellant | : | No. 2479 EDA 2021 |

Appeal from the Judgment of Sentence Entered September 9, 2021
In the Court of Common Pleas of Lehigh County
Criminal Division at CP-15-CR-0002916-2019

BEFORE:  LAZARUS, J., KUNSELMAN, J., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:                    **FILED MAY 23, 2023**

Steven Oliemuller (Appellant) appeals from the judgment of sentence imposed after a jury convicted him of third degree murder.[1]  We affirm.

The trial court summarized the following facts:

On June 18, 201[8], at approximately 8:18 a.m., Pennsylvania State Police [PSP] responded to a 9-1-1 call at 7245 McFettridge Lane, Lower Milford Township, Lehigh County, for the report of a possible drug overdose.  Upon arrival, Troopers observed an unconscious female, later identified as Alexus Quay [the Victim], on the floor of a first-floor bedroom.  …

[Appellant] informed police about his romantic relationship with the [Victim].  He admitted he was the only one at the residence with her and last saw [the Victim] the night before sitting on the deck of the[ir] residence.  Trooper [Steven] Furlong testified that first-responders were concerned that the case was not a drug overdose because of the significant injuries found on [the Victim's] body.  Police observed significant physical injuries to [the Victim's] head, stomach, back, arms, and legs.  The

---

[1] 18 Pa.C.S.A. § 2502(c).

injuries included open wounds and what appeared to responders as "drag marks." Straw and other debris were observed on her body and her hair was wet.

Troopers inspected the residence and discovered red stains on a second-floor bedroom mattress and pillow. A framing hammer was observed on the floor at the foot of the bed. The door to the bedroom was damaged and numerous articles of clothing were strewn across the side yard of the residence. Water was discovered on the kitchen, living room, and hallway floors leading to the bedroom where [the Victim's] body was found. A prescription pill bottle and screwdriver were located on the deck where [Appellant] indicated he last saw [the Victim]. [Appellant] exhibited injuries to his hands, forearms, and face[,] which appeared to responders as scratches and a fat lip.

Trial Court Opinion, 11/10/20, at 2-3.

The Commonwealth charged Appellant with murder by criminal information filed August 1, 2019. Thereafter, the Commonwealth filed notice of intent to present prior bad acts evidence at trial. Appellant filed a response seeking to preclude the evidence. The trial court entered an order granting the Commonwealth's request on November 10, 2020.

Trial commenced June 8, 2021, and concluded with the jury's guilty verdict on June 17, 2021. Forensic pathologist Rameen Starling-Roney had testified that the Victim's manner of death was homicide, and the cause of death was blunt-force trauma to various parts of the body. N.T., 6/9/21, at 201. Dr. Starling-Roney noted the presence of prescription medication and methamphetamine (meth) in the Victim's body, but ruled out drug overdose as the cause of death. *Id.* at 201-05. He also opined that the blunt force trauma could not have been caused accidentally. *Id.* at 204-05.

- 2 -

Multiple witnesses testified about Appellant's meth use and the behavioral changes it caused. ***See***, ***e.g.***, N.T., 6/9/21, at 108-09, 127-33; N.T., 6/10/21, at 42-83; N.T., 6/15/21, at 40-148; N.T., 6/16/21, at 123-59. The witnesses testified that Appellant became paranoid and violent when using meth. ***See id.*** The witnesses also testified that Appellant used meth on the weekend of the Victim's murder; this testimony was confirmed by drug test results. ***See*** N.T., 6/14/01, at 204-05 (Appellant's urine tested positive for meth).

Specifically, Appellant's cousin, Chuck Gischel (Gischel), testified he and Appellant regularly used meth. N.T., 6/15/21, at 274-75. Gischel testified that he observed Appellant use meth in the late evening of Saturday, June 16, 2018, and/or the early morning of Sunday June 17, 2018. ***Id.*** at 278-79. He also saw Appellant ingest meth later in the morning of June 17, 2018. ***Id.*** at 284.

Appellant's sister's former boyfriend, Charles Price (Price), testified that he and Appellant used meth (and other drugs). N.T., 6/10/21, at 50-51. Price relayed that on the Saturday before the Victim's death, the Victim and Appellant attended a birthday party for Price's daughter. ***Id.*** at 48, 50-51. The next evening, Appellant called his sister, Haleigh Oliemuller (Haleigh), and Price overhead Appellant state that he would "drag [Price] with a chain." ***Id.*** at 52. Appellant threatened that if Price did not go to Appellant's home, Appellant would come to Price. ***Id.*** at 53. Price described Appellant's voice

as "irate, a little frantic" and "stressed and angry." *Id.* Price explained that Appellant acted this way when he used meth. *Id.* at 74. After speaking with Appellant, Price took his family, sometime between 10:00 and 11:00 that Sunday night, to a hotel because he "wasn't taking any chances." *Id.* at 56. Price testified that Appellant "definitely sounded upset" and Price was afraid of Appellant. *Id.* at 56-57. Price and his family spent two nights at a hotel in Landsdale. *Id.* at 58-59. They then spent another two nights at a hotel in Colmar, even though they had learned about the Victim's death, because Price "wasn't taking any chances." *Id.* at 58-59, 79. Price stated that he wanted to "make sure [his] family was safe." *Id.* at 80.

Price further testified that Appellant had hit him with a closed fist while using meth, and Price was "afraid" of Appellant "at times." *Id.* at 60, 63-64. After hitting Price, Appellant "shot a couple rounds into the wall [of Appellant's home]" with a .22 firearm. *Id.* at 65. On another occasion, when Appellant was using meth and Price refused to lend him a car, Appellant slapped Price across the face. *Id.* at 67-68. Price described Appellant as "very paranoid … agitated[, and] thought everybody was out to get him." *Id.* at 75.

Appellant's sister, Haleigh, testified reluctantly; consequently, the Commonwealth introduced her grand jury testimony. N.T., 6/15/21, at 40-148. Haleigh stated that the Victim would stay at her house when Appellant and Gischel were using drugs. *Id.* at 56-60. Haleigh admitted she, Appellant and Gischel used meth the weekend of the Victim's death. *Id.* at 61, 98-101.

She agreed that Appellant's behavior changed when he used meth and he would experience hallucinations. *Id.* at 65-70. Through her grand jury testimony, Haleigh corroborated Price's testimony about getting "weird" phone calls from Appellant on the night of June 17, 2018. Haleigh's grand jury testimony further confirmed that after warning Appellant's former paramour, Ashley Swartley (Swartley), about Appellant's behavior, she, Price, and their children quickly left their residence and stayed at two out-of-county hotels for four nights. *Id.* at 123-42.

Swartley testified that she had been involved with Appellant for over 15 years and they shared two children. N.T., 6/16/21, at 123-25. She averred that Appellant's meth use was a factor in the end of their relationship. *Id.* at 126. Swartley did not want the couple's children around Appellant when he was using drugs, so she would take the children and stay away from Appellant for days at a time. *Id.* Swartley stated that when she started leaving with the children, Appellant "would be very upset, aggressive, wanting us to come home. If I wouldn't bring the kids home[, he] threatened to kill me and kill my family." *Id.* at 127. She described that when Appellant used meth:

> He believed there were people outside on the property at times. He believed that there were drones flying over the property and watching us.
>
> At one point[, Appellant said] there was a box of puppies dropped off on our porch … and I went out and there was not a box of puppies on the porch.

- 5 -

*Id.* at 128. Swartley testified that Appellant could become violent when using meth, and described him grabbing her, shoving her against a wall, and pushing her to the ground. *Id.* at 129. Swartley recalled an incident where Appellant took her phone, disabled her car, and prevented her from leaving the home because he believed people were watching. *Id.* at 129-30. Swartley recounted incidents which occurred within two months of the Victim's death, when the Victim contacted Swartley and asked her to pick up the children because the Victim was concerned about Appellant's drug use and some of his associates. *Id.* at 141-46. Lastly, Swartley testified that Haleigh called her on the night of June 17, 2018 to ask if she and Price could stay with her because Appellant was threatening to kill Haleigh and Price. *Id.* at 155.

Michelle Halbsgut (Halbsgut), the Victim's instructor at the Pennsylvania Institute for Massage Therapy, testified to the change in the Victim's behavior, from being a model student in January 2018, to missing classes in March 2018. N.T., 6/15/21, at 305-06, 309-10. Halbsgut explained that part of massage training involves students practicing on one another, and in March 2018, Appellant was often unable to be massaged because her body was covered with bruises. *Id.* at 308, 316-21.

Trooper Edward Prentice testified that upon seeing the Victim's body, he questioned Appellant, who did not give direct answers, and had a "shaky" voice and "visibly shaking" hands. N.T., 6/9/21, at 109. Trooper Prentice stated that Appellant agreed to go to the police barracks, where he was seated

in an area with windows 6 - 9 feet from the ground. *Id.* at 131. Appellant repeatedly said that he saw someone outside, even though it was impossible. *Id.* Appellant also maintained there was someone in an air vent and he heard "tapping" noises in the hallway. *Id.* Later, Appellant threw a book at Trooper Prentice. *Id.* at 132. Trooper Prentice opined that Appellant was coming down from a meth high. *Id.* at 145. Trooper John McGranahan also encountered Appellant that day, and described him as "very combative." N.T., 6/10/21, at 113.

April Cooper, a psychiatric evaluator at Lehigh Valley Hospital, evaluated Appellant the evening of June 18, 2018. N.T., 6/15/21, at 25-26. She described Appellant as having a "blunted affect." *Id.* at 28. She relayed that Appellant admitted to using meth that day. *Id.* at 29-30. Appellant told Ms. Cooper the police brought him to the hospital because he was hallucinating, but he believed the police "were messing with him and berating him. … [The police] were hiding behind [] a curtain in a window, and [Appellant] … threw something at the window." *Id.* at 31. Ms. Cooper concluded Appellant did not have a psychiatric disorder, and his hallucinations were the result of drug use. *Id.* at 32.

The Commonwealth also elicited testimony from two jailhouse informants, Jason Swiderski (Swiderski) and Daniel Santiago (Santiago). Both men had extensive criminal records, and received favorable consideration in

pending cases in return for their testimony. N.T., 6/14/21, at 92-95; N.T., 6/15/21, at 212-14.

Swiderski testified that Appellant told him he and the Victim were using meth; Appellant was giving the Victim drugs to calm her down; and "he beat her up, slapped her around[.]" N.T., 6/14/21, at 106. Swiderski claimed Appellant admitted "he beat the living shit out of her and he gave her a hot shot, mother of all shots …." *Id.* at 108. Appellant then "found out after seeing her on the ground that she was dead." *Id.* Appellant disputed these claims, and his counsel cross-examined Swiderski extensively, implying that Swiderski would say anything to get a favorable deal from the Commonwealth. *See id.* at 118-86.

Santiago testified Appellant told him and Santiago's friend, "Huey," that Appellant "had an argument with his girlfriend because he slipped something into her drink … he pushed her[,] and her head hit something[,] and she was on the floor." N.T., 6/15/21, at 226. Appellant related that he "blacked out and started hitting" the Victim, and "could not recall what he hit her with." *Id.* Defense counsel cross-examined Santiago, and suggested Santiago would lie to get favorable treatment. *Id.* at 230-64.

On June 17, 2021, the jury convicted Appellant of third-degree murder. On September 9, 2021, the trial court sentenced Appellant to 20 — 40 years in prison. Appellant successfully sought permission to appeal *nunc pro tunc*. Appellant appealed and on March 8, 2022, this Court remanded the case for

Appellant to file a Pa.R.A.P. 1925(b) statement as ordered by the trial court.

Appellant and the trial court have since complied with Rule 1925.

Appellant raises three issues for review:

1. Did the trial court err in admitting prior bad acts testimony about [Appellant's] prior domestic abuse and prior drug use from [Swartley]?

2. Did the trial court err in denying [Appellant's] request for a mistrial when two PSP Troopers testified to his pre-arrest silence, his request for an attorney and invocation of his 5th and 14th Amendment rights under the United States Constitution and Article 1, Section 9 of the Pennsylvania Constitution as such evidence was used against [Appellant] as evidence of guilt?

3. Did the trial court err in not giving the jury an instruction on involuntary manslaughter?

Appellant's Brief at 3.

In his first issue, Appellant contends the trial court wrongly admitted "character testimony" from Swartley. Appellant's Brief at 25. Appellant maintains

all of her testimony except that small portion about her observations of [the Victim] on June 16th and 17th of 2018 should have been inadmissible as some of it was irrelevant but all of its probative value was outweighed by the prejudice, especially considering the sequencing of the witnesses called, Swartley was the last called by the Commonwealth right after the lead investigator from the PSP. Admissible [*sic*] of this testimony was error, and the Commonwealth cannot show beyond a reasonable doubt that the verdict would be the same even if such testimony was not admitted.

*Id.*

Our scope and standard of review concerning the admission of prior bad acts is well settled:

> The admission of evidence is a matter vested within the sound discretion of the trial court, and such a decision shall be reversed only upon a showing that the trial court abused its discretion. In determining whether evidence should be admitted, the trial court must weigh the relevant and probative value of the evidence against the prejudicial impact of that evidence. Evidence is relevant if it logically tends to establish a material fact in the case or tends to support a reasonable inference regarding a material fact. Although a court may find that evidence is relevant, the court may nevertheless conclude that such evidence is inadmissible on account of its prejudicial impact.
>
> Evidence of prior bad acts committed by a defendant is not admissible solely to show the defendant's bad character or his propensity for committing bad acts. However, evidence of prior bad acts is admissible where there is a legitimate reason for the evidence, such as to establish: 1) motive; 2) intent; 3) absence of mistake or accident; 4) a common scheme or plan; and 5) identity. The evidence may also be admissible to impeach the credibility of a testifying defendant; to show that the defendant has used the prior bad acts to threaten the victim; and in situations where the bad acts were part of a chain or sequence of events that formed the history of the case and were part of its natural development.

*Commonwealth v. Page*, 965 A.2d 1212, 1219 (Pa. Super. 2009) (citation and emphasis omitted).

Appellant has waived his claim that the trial court erred in admitting irrelevant — and unspecified — portions of Swartley's testimony. In his response to the Commonwealth's notice of intent to use prior bad acts evidence, Appellant did not challenge the relevance, but argued the evidence was not proper Rule 404(b) evidence. Response to Commonwealth's Petition to Admit Prior Bad Acts, 10/20/20, at 1-7. During Swartley's testimony,

- 10 -

Appellant raised a single objection to a portion of her testimony on relevance grounds and the trial court **sustained** the objection. N.T., 6/16/21, at 156-58.

> It is well-established that [a] party complaining, on appeal, of the admission of evidence in the court below will be confined to the specific objection there made. **If counsel states the grounds for an objection, then all other unspecified grounds are waived and cannot be raised for the first time on appeal.**

*Commonwealth v. McGriff*, 160 A.3d 863, 871-72 (Pa. Super. 2017) (emphasis added). Because Appellant either failed to object or objected on different grounds, he waived any challenge to Swartley's testimony based on relevance.

Appellant also argues the trial court improperly admitted Swartley's testimony about his drug use because it did not demonstrate "a true distinct pattern of crime" and was not "*modus operandi*." Appellant's Brief at 21; *see generally id.* at 21-27. However, the trial court did not permit the testimony to show a signature or pattern crime, but to demonstrate Appellant's

> state of mind at the time of the Victim's death, the lack of accident or absence of mistake, [Appellant's] motive for the killing, as well as to show the natural progression of events leading up to [the Victim's] death.

Trial Court Opinion, 11/10/20, at 12. With respect to Swartley's testimony about domestic violence, the trial court did not admit it as "pattern" evidence, but because it "demonstrate[d Appellant's] intent to kill and the absence of accident or mistake at the time of the offense." *Id.* at 13. Appellant does

- 11 -

not cite any law or argue that the trial court erred in admitting Swartley's testimony for these reasons. *See* Appellant's Brief at 21-27.

Even if we were to assume, *arguendo*, that Swartley's testimony was wrongly admitted, we would find any error harmless because Swartley's testimony was cumulative. The harmless error doctrine "reflects the reality that the accused is entitled to a fair trial, not a perfect trial." ***Commonwealth v. Hairston***, 84 A.3d 657, 671 (Pa. 2014).

> Harmless error exists if the record demonstrates either: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Id.* at 671–72.

As discussed above, the record demonstrates Gischel, Price, and Haleigh testified about Appellant's history of meth use, and in particular, his use of meth in the days preceding the Victim's death. N.T., 6/10/21, at 50-51; N.T., 6/15/21, at 61, 98-101, 274-75, 278-79, 284. Price and Haleigh testified that Appellant's personality changed when he used meth, and he became paranoid, hallucinated, and acted violently. N.T., 6/10/21, at 52, 56-57, 60, 64-65, 67-68, 74-75; N.T., 6/15/21, at 65-70, 123-42. Troopers Prentice and McGranahan, as well as the psychiatric evaluator, Cooper, had observed Appellant under the influence of meth shortly after the Victim's death and

corroborated the testimony of Gischel, Price, and Haleigh. *See* N.T., 6/9/21, at 131-32; N.T., 6/10/21, at 113; N.T., 6/15/21, at 28-32.

In addition, Price and Haleigh testified that Appellant threatened them when he called the night before the Victim's death, and as a result, they took their family to stay at a hotel out of the county. N.T., 6/10/21, at 53, 55-59, 80; N.T., 6/15/21, 123-42. Haleigh testified that the Victim did not like to be around Appellant when he and Gischel were using drugs and would stay at Haleigh's house. N.T., 6/15/21, at 56-60. Halbsgut testified about the Victim having bruises on her body prior to her death. N.T., 6/15/21, at 316-21. Thus, Swartley's testimony was cumulative of other witnesses' testimony. Appellant's first issue does not merit relief. *See Hairston*, 84 A.3d at 671-72.

In his second issue, Appellant claims the trial court erred in denying his motion for a mistrial after Troopers Prentice and McGranahan testified that while at the police station and served with search warrants for his clothes and person, Appellant requested counsel. N.T., 6/9/21, at 129; N.T., 6/10/21, at 113.[2] Appellant's Brief at 27-30. Appellant argues the Commonwealth "used

_____

[2] Appellant waived his claims regarding other purportedly improper testimony by Trooper Prentice and psychiatric evaluator Cooper concerning his silence. Appellant did not object to the testimony or raise it in his motion for a mistrial. *See* N.T., 6/9/21, at 168-69; N.T., 6/15/21, at 31. Appellant sought a mistrial on the basis that Troopers Prentice and McGranahan improperly commented on his pre-arrest silence, not on the basis, advanced on appeal, that their testimony Appellant was not acting like a grief-stricken person constituted
*(Footnote Continued Next Page)*

these refences … about [Appellant's] pre- and post-arrest silence … as evidence of guilt against him." Appellant's Brief at 29.

Initially, the record does not support Appellant's contention that Troopers Prentice and McGranahan commented on his post-arrest silence. The above incidents occurred at the police station **prior** to Appellant's arrest. **See** N.T., 6/9/21, at 129-34; N.T., 6/15/21, at 31-33. Thus, there is no basis for Appellant's claim regarding his post-arrest silence. To the extent Appellant avers violation of his rights under the Pennsylvania Constitution, Appellant waived the issue because it is not developed in his brief. **See** Appellant's Brief at 27-30. **See also Commonwealth v. Wise**, 171 A.3d 784, 791 (Pa. Super. 2017) (issue waived where appellant provided an undeveloped argument and neglected to cite to controlling case law). Thus, we only address Appellant's claim that the trial court erred in denying a mistrial where Troopers Prentice and McGranahan improperly commented on Appellant's pre-arrest silence.

---

improper comments on his pre-arrest silence. N.T., 6/10/21, at 117-21; Appellant's Brief at 29. "[O]ne must object to errors, improprieties or irregularities at the earliest possible stage of the adjudicatory process to afford the jurist hearing the case the first occasion to remedy the wrong and possibly avoid an unnecessary appeal to complain of the matter." **Keffer v. Bob Nolan's Auto Service, Inc.**, 59 A.3d 621, 645 (Pa. Super. 2012); **see also Commonwealth v. Baumhammers**, 960 A.2d 59, 73 (Pa. 2008) (to preserve issue, party must make timely and specific objection to ensure the trial court has opportunity to correct alleged error). Appellant cannot raise a new legal theory on appeal. **See Commonwealth v. Truong**, 36 A.3d 592, 598-99 (Pa. Super. 2012) (*en banc*).

We review the denial of a motion for mistrial for an abuse of discretion.

***Commonwealth v. Chamberlain***, 30 A.3d 381, 422 (Pa. 2011).  We have explained:

> In criminal trials, declaration of a mistrial serves to eliminate the negative effect wrought upon a defendant when prejudicial elements are injected into the case or otherwise discovered at trial.  A trial court may grant a mistrial only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict.  It is also settled that **a mistrial is not necessary where cautionary instructions are adequate to overcome any potential prejudice**.

***Commonwealth v. Gilliam***, 249 A.3d 257, 274 (Pa. Super. 2021) (emphasis added, citations omitted), ***appeal denied***, 267 A.3d 1213 (Pa. 2021).  Trial courts "must consider all surrounding circumstances before finding that curative instructions were insufficient and the extreme remedy of a mistrial is required."  ***Commonwealth v. Manley***, 985 A.2d 256, 266 (Pa. Super. 2009) (citation omitted).

"The Fifth Amendment was enacted to protect against self-incrimination, whether [the suspect is] in custody or not, charged with a crime, or merely being questioned during the investigation of a crime." ***Commonwealth v. Molina***, 33 A.3d 51, 63 (Pa. Super. 2011) (*en banc*) (citation omitted).  "[T]he government may not use ... silence as substantive evidence of guilt when a defendant chooses not to testify.  ... [That silence] may also not be used against a defendant who remained silent during the investigation of a crime." ***Id.*** (citation omitted).

- 15 -

The Fifth Amendment "does not impose a *prima facie* bar against **any** mention of a defendant's silence." ***Id.*** (emphasis added). Instead, the Fifth Amendment protects against the prosecution's exploitation of a defendant's right to remain silent. ***See id.*** "[A] mere reference to pre-arrest silence does not constitute reversible error where the prosecution does not exploit the defendant's silence as a tacit admission of guilt." ***Commonwealth v. Adams***, 104 A.3d 511, 512-13 (Pa. 2014).

Here, the Commonwealth asked Trooper Prentice about Appellant's demeanor during questioning immediately after police discovered the Victim's body. N.T., 6/9/21, at 108-09. As to Appellant's demeanor at the police barracks, the Commonwealth asked:

> Q. Would you describe for the jury anything you observed about [Appellant's] behavior and demeanor during that time?
>
> A. For the search warrant to be executed on the clothing, he was argumentative about all of that. He requested private counsel.
>
> [Defense Counsel]: Objection. Can we approach, Judge?
>
> * * *
>
> [Defense Counsel]: I believe that my client's indication [*sic*] that his 5th Amendment rights is not permissible in this evidence.
>
> The Court: So what are you asking the court to do?
>
> [Defense Counsel]: **I'm going to ask for a very strong curative instruction, Your Honor.**
>
> * * *
>
> The Court: Okay. I'll give an instruction. Okay.

- 16 -

All right. Ladies and gentlemen of the jury, I'm going to sustain that objection. You are to totally disregard that response. Okay?

*Id.* at 129-30 (emphasis added). Appellant did not object further or otherwise seek relief.

The next day, the Commonwealth questioned Trooper McGranahan about Appellant's behavior when the trooper attempted to serve Appellant with a body search warrant:

Q. Was [Appellant] cooperative?

A. No.

Q. What do you mean?

A. He was very combative. He wouldn't let us take any photographs of him. He kept arguing and fighting with us. He kept repeating he wanted to talk to a lawyer.

N.T., 6/10/21, at 113.

Defense counsel objected, noting it was the second time a trooper mentioned Appellant's invocation of his Fifth Amendment rights, and requested a mistrial. *Id.* at 113-14. After hearing argument, the trial court denied the motion, stating:

Okay. I'm satisfied that a detailed curative instruction or cautionary instruction will suffice at this point, but I certainly respect defense counsel's position on this.

I would ask both of you just to instruct your witnesses before they get on the stand, don't mention anything of that nature in the future. All right? Because the third time around, you may not be so lucky. Okay.

\*\*\*

- 17 -

Just so the record is clear, I do not find that there's a manifest necessity for a mistrial.

N.T., 6/10/21, at 121-22; *see also id.* at 114-22. The trial court then instructed the jury to disregard testimony about Appellant's request for counsel because,

that testimony under the Pennsylvania and the United States Constitution, that any individual who is the subject of an investigation has that right; however, that's not something that normally comes out in trial, and it should not come out in trial. So I am directing you to totally disregard that testimony. It's not to be considered in your determination of whether [Appellant] is guilty or not guilty in this case. All right? So that testimony is stricken.

*Id.* at 123. Defense counsel did not object to the instruction or seek further redress.

Our review reveals the troopers did not explicitly reference Appellant's right to remain silent and the Commonwealth did not "exploit [Appellant's] silence as a tacit admission of guilt." *Adams*, 104 A.3d at 513. The testimony from Troopers Prentice and McGranahan was "contextual and brief." *See id.* at 518. There was no further mention of Appellant's pre-arrest silence or his invocation of right to counsel. *See Adams*, 104 A.3d at 515. Finally, the trial court gave a sufficient curative instruction. We presume a jury follows a court's instruction. *See Commonwealth v. Speight*, 854 A.2d 450, 458 (Pa. 2004). We cannot conclude that the trial court erred in denying Appellant's request for a mistrial. Thus, Appellant's second issue does not merit relief.

In his final issue, Appellant argues he was entitled to a jury instruction on involuntary manslaughter. Appellant's Brief at 30-31. Appellant contends the evidence indicated the Victim

> may have been hit by her own car, or injured and moved through [Appellant's house], or was moved by someone, multiple times. Furthermore, both jail-house witnesses presented [testimony] against [Appellant;] Santiago and Swiderski mentioned some type of incident where [Appellant] admitted to drugging [the Victim] shorty before her death. The science shows [the Victim] died of blunt force injuries, but it's ultimately speculation as to what specifically caused them. Apart, or perhaps in conjunction with the drugging, Appellant could have assaulted [the Victim] and his further negligence and recklessness led to her death.

*Id.*

> Pertinently:

> In reviewing a jury charge, we determine whether the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case. We must view the charge as a whole; the trial court is free to use its own form of expression in creating the charge. A trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration. Moreover, it is well-settled that the trial court has wide discretion in fashioning jury instructions. **The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the appellant was prejudiced by that refusal.**

*Commonwealth v. Williams*, 176 A.3d 298, 314 (Pa. Super. 2017) (citations omitted, emphasis added).

> The Crimes Code provides:

> A person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly

negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person.

18 Pa.C.S.A. § 2504(a).

Furthermore:

Defendants are generally entitled to instructions that they have requested and **that are supported by the evidence**. *Commonwealth v. Markman*, 591 Pa. 249, 916 A.2d 586, 607 (2007); *Commonwealth v. DeMarco*, 570 Pa. 263, 809 A.2d 256, 261 (2002) ("Where a defendant requests a jury instruction on a defense, the trial court may not refuse to instruct the jury regarding the defense if it is supported by evidence in the record."); *Commonwealth v. Browdie*, 543 Pa. 337, 671 A.2d 668, 673–74 (1996) ("[W]e hold that a trial court shall only instruct on an offense where the offense has been made an issue in the case and where the trial evidence reasonably would support such a verdict."). We have explained that the reason for this rule is that "instructing the jury on legal principles that cannot rationally be applied to the facts presented at trial may confuse them and place obstacles in the path of a just verdict." *Commonwealth v. Taylor*, 583 Pa. 170, 876 A.2d 916, 925–26 (2005) (quoting *Commonwealth v. White*, 490 Pa. 179, 415 A.2d 399, 400 (1980)). A criminal defendant must, therefore, "establish that the trial evidence would 'reasonably support' a verdict based on the desired charge and may not claim entitlement to an instruction that has no basis in the evidence presented during trial." *Id.* (citing *Commonwealth v. Carter*, 502 Pa. 433, 466 A.2d 1328, 1332–33 (1983)).

*Commonwealth v. Hairston*, 84 A.3d 657, 668 (Pa. 2014) (emphasis added). "An instruction on involuntary manslaughter is not required unless it has been made an issue in the case and the facts would support such a verdict." *Commonwealth v. Fletcher*, 986 A.2d 759, 791 (Pa. 2009).

Involuntary manslaughter was never at issue in this case. There is no record support for Appellant's claim that the Commonwealth suggested the Victim was hit by a car. While Santiago and Swiderski testified Appellant told

- 20 -

them he gave the Victim drugs and she died while he was assaulting her, Appellant strongly implied that both men were lying. *See* N.T., 6/14/21, at 106-08, 118-86; N.T., 6/15/21, at 226, 230-64.

In his opening, defense counsel argued the Commonwealth, "zeroed in on [Appellant] at the expense of what actually happened." N.T., 6/9/21, at 19. Counsel asserted the "mess" in the house was not caused by a "great brawl," but because Appellant "had millions of projects going on, also while on meth." *Id.* at 21. Counsel argued:

> You'll say, man, those photos, man, they didn't match up, why didn't [the Commonwealth] investigate this. Think about that, be intellectually curious. Why didn't the detectives do this, why didn't the trooper do this, and think about it and say, man, I wish they did more, and you're going to say, why didn't they do more? Well, they are focusing on [Appellant] because [Appellant] can be an asshole and he was an asshole to them that night.

*Id.* at 22. Counsel also pronounced that Appellant, "didn't murder her." *Id.* at 23.

Appellant's defense was that he did not cause the Victim's death, but police focused only on him and thus conducted a tainted and shoddy investigation. *See*, *e.g.*, N.T., 6/9/21, at 244-78 (defense counsel implying trooper did not properly investigate the case); N.T., 6/11/21, at 133-35 (defense counsel referencing lack of serious injuries to Appellant despite Commonwealth's claim that he beat the Victim to death); *id.* at 141 (defense counsel criticizing investigators for taking videos only inside the home); *id.* at 146-47 (defense counsel criticizing investigators for not using drug dogs); *id.*

at 156 (defense counsel implying investigators tampered with evidence at crime scene); N.T., 6/14/21, at 85 (defense counsel criticizing serologist about delays in testing items for blood); N.T., 6/16/21, at 77-78 (defense counsel cross-examining lead investigator about failure to conduct a grid search of the property or use metal detectors).

Appellant's defense was incompatible with the crime of involuntary manslaughter. **See Fletcher**, 986 A.2d at 791; **see also Commonwealth v. Wright**, 865 A.2d 894, 917 (Pa. Super. 2004) (defendant not entitled to instruction on involuntary manslaughter where he denies committing any act causing the victim's death). Therefore, Appellant's final issue does not merit relief.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/23/2023